(No. 69790.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TERRY GRIGGS, Appellant.

*Opinion filed September 24, 1992.—Modified on denial of rehearing November 30, 1992.*

CLARK, J., specially concurring.
MILLER, C.J., joined by HEIPLE, J., dissenting.

Randolph N. Stone, Public Defender, of Chicago (Stephen L. Richards, Assistant Public Defender, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Randall Roberts, Kevin Sweeney and Walter P. Hehner, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant, Terry Griggs, was found guilty of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)). Defendant was sentenced to serve 20 years in the Illinois Department of Corrections. Defendant's conviction was affirmed in the appellate court. (192 Ill. App. 3d 1105 (unpublished order under Supreme Court Rule 23).) This court allowed defendant's petition for leave to appeal (134 Ill. 2d R. 315). We reverse the judgment of the ap-

pellate court and remand to the circuit court for further proceedings.

Defendant raises several issues: (1) whether defendant's constitutional rights were violated when police failed to inform him that an attorney retained to represent him was present at the place of interrogation and seeking to consult with him; (2) whether the circuit court erred in allowing the State to amend the indictment against defendant; (3) whether defendant was proved guilty of murder beyond a reasonable doubt; and (4) whether the State disproved defendant's affirmative defense beyond a reasonable doubt.

On February 5, 1986, Charpel Jahnke, an employee of People's Gas Company, was working at 8615 South Cregier in Chicago. At approximately 3:45 p.m., Jahnke was struck by a bullet from a gun which was fired by defendant. Jahnke died from the gunshot wound which entered his body through his left shoulder. At approximately 4 p.m., defendant was arrested and taken to the police station for questioning.

According to the State, defendant, without provocation, shot at a group of young men walking behind him on South Cregier. The State argued that defendant's intent to kill any member of this group was transferred to Jahnke. According to defendant, he fired a gun in order to protect himself from a gang, some of whose members had baseball bats, which was chasing him. The defendant argued that his use of force in self-defense was transferred to Jahnke.

Before trial, defendant made a motion to suppress a statement which was reduced to writing by an assistant State's Attorney during custodial interrogation. The circuit court denied the motion. Before discussing the evidence produced at trial, we will discuss the evidence produced at the hearing on the motion to suppress.

## Motion to Suppress

Defendant was 21 years old, married, and employed as a data entry operator for Continental Bank. Defendant was arrested at approximately 4 p.m. on February 5, 1986. He was taken to the police station, where he was fingerprinted at approximately 5 p.m. It appears that defendant's brother, Milton, was also taken to the stationhouse. Defendant testified he was questioned before he was fingerprinted by two plainclothes officers, one of whom, Detective Gallagher, had testified at the hearing. Defendant did not recall being advised of his constitutional rights.

Somewhere between 5:30 p.m. and 5:45 p.m., defendant called his sister, Shelvon Griggs. Ms. Griggs told defendant, "[D]on't worry because first of all we'd gotten [you] a lawyer and so don't say anything to nobody." She told defendant the attorney's name. Griggs testified defendant said he understood what she was saying. Ms. Griggs later testified that the attorney was hired after she had received the phone call from defendant.

Defendant testified that Ms. Griggs told him that she and her sister were trying to get a lawyer for him and that the lawyer would be there soon. Defendant stated he asked his sister the name of the attorney, but had nothing upon which to write the name.

Defendant was questioned in an interview room by Detectives John Gallagher and William Egan at approximately 6 p.m. or 7 p.m. for 15 or 30 minutes. According to Detectives Gallagher and Egan, defendant was advised of his constitutional rights. Detective Gallagher testified that defendant stated he understood his rights. Defendant gave an oral statement. Defendant never stated he had an attorney nor did he ask for one. Defendant was then taken back to his cell.

Defendant testified that he asked the officers to wait to question him because his lawyer was either on his way or was there already. Defendant was told he would have to wait to see his lawyer. Defendant had never been arrested before and was not familiar with everything concerning the procedure which goes on following an arrest.

Defendant was, at some point, taken from his cell, placed in a lineup, and returned to his cell. Detective Egan testified that, after the lineup, he had a five-minute conversation with defendant in his cell, at which time defendant said nothing about an attorney, but did say he wanted to speak to his wife. Detective Egan told defendant that after the investigation was completed, he would see if defendant could possibly see his wife.

Defendant testified that both of the plainclothes officers who had interviewed him previously talked to him in his cell. Defendant thought this occurred at approximately 9:15 p.m. Defendant asked to see his lawyer and was informed he would have to wait for the assistant State's Attorney to arrive. Defendant was told that once he had given a statement, perhaps "we'll see if you can see your lawyer or your wife."

Defendant was taken from his cell and returned to the interview room for another interrogation at approximately 9 p.m. or 9:30 p.m. Present were Detective Gallagher, Assistant State's Attorney LuAnn Rodi, and defendant. Rodi had arrived at the police station at approximately 7:30 p.m. and was present for the lineup. Rodi testified she recited the *Miranda* rights to defendant, who said he understood them. According to Rodi, defendant said he wanted to see his wife, but did not ask to talk with her. Rodi explained that they were in the middle of a statement and if defendant's wife were present at the stationhouse, arrangements could surely be made for defendant to speak with her. Rodi and De-

tective Gallagher both testified that at no time did defendant ask for an attorney.

Defendant testified he asked to see his lawyer; Rodi told him he could see his lawyer and his wife after he gave a statement. Defendant could not recall being told of his constitutional rights.

Defendant was questioned for about 30 minutes to an hour. It took Rodi half an hour to reduce the contents of the conversation to writing. Defendant signed each page of the three-page statement. The *Miranda* rights appeared at the top of each page. Defendant did not recall reading the *Miranda* rights. Rodi stated that defendant made several corrections. Rodi testified defendant signed the statement at approximately 10 p.m. Detective Gallagher testified that defendant asked to speak with his wife; Detective Gallagher believed defendant asked this after he signed the statement.

Edward Kalish, an attorney, testified that he had received a phone call from defendant's sister at approximately 6 p.m. or 6:30 p.m. on February 5, 1986. Defendant's sister asked to retain Kalish to represent defendant, and Kalish agreed. Defendant's sister called back about 15 to 20 minutes later. This would have been somewhere between 6:45 p.m. and 7 p.m. Kalish went to defendant's mother's house to pick up defendant's sister sometime between 8 p.m. and 9 p.m. Kalish and defendant's sister went to the police station, which was a 15- or 30-minute drive. Kalish arrived at the police station around 9 p.m. or 9:30 p.m.

Present at the police station were defendant's mother and father, and several of defendant's brothers and sisters. Kalish introduced himself and then informed the desk sergeant that he had been retained by defendant and Milton Griggs' family to represent defendant and Milton, defendant's brother. Kalish told the desk sergeant he would like to talk with his client.

The desk sergeant told Kalish his client was being interrogated and gave him a form to fill out. The desk sergeant indicated that he would get back to Kalish in a few minutes. After 10 or so minutes, during which time Kalish spoke with defendant's family, Kalish spoke with the desk sergeant again. Kalish testified he again showed the desk sergeant his attorney identification and stated he wanted to talk with his client, "particularly [defendant]." Kalish stated that he told the desk sergeant, "The interrogation ought to be stopped, I'm now reaffirming the fact I wish to speak with my client." The desk sergeant informed Kalish that he could not talk with his client.

Kalish spoke with Milton for about five minutes in a small interview room. Afterwards, Kalish again told the desk sergeant he wished to speak with defendant. The desk sergeant told Kalish to speak to the assistant State's Attorney handling the interrogation, Rodi. The time was approximately 10 p.m. or 10:30 p.m.

Kalish showed the assistant State's Attorney his attorney identification, explained he had a written contract evidencing the fact that defendant's family had retained him as attorney for defendant, and stated he wanted to speak with both defendant and Milton. Kalish testified that the assistant State's Attorney said she was not going to interrupt the interrogation of defendant, and that Kalish would be able to speak to defendant eventually. Kalish stated he remembered "affirming the fact that my client has a right to talk to me now, right now."

At this point, the assistant State's Attorney left, and Kalish again told the desk sergeant that he would like to speak with defendant. Kalish spoke with the assistant State's Attorney again; he went with her to see Milton. When Kalish requested to see defendant, he was told by Rodi that that was his problem. This was approximately

midnight or later. Milton signed a document; Kalish, Rodi and a detective were present.

Kalish was allowed to see defendant sometime after midnight. He thought he was aware that defendant had already given a statement when he saw Milton the second time. Kalish withdrew as attorney of record for defendant on February 14, 1986, and had no professional affiliation with defendant's trial counsel.

Sometime between 9:45 p.m. and 10 p.m., desk sergeant Chengary introduced Detective Egan to Kalish. Sergeant Chengary told Detective Egan that Kalish had been retained by the Griggs family and wanted to speak to Milton. Approximately 15 minutes after Detective Egan met Kalish, Rodi came out of the interview room; Detective Egan told Rodi that Kalish had been retained to represent defendant and that Kalish wanted to speak with defendant.

Detective Egan testified that Kalish "stated that he would like to speak with Terry Griggs upon the completion of the interview that Assistant State's Attorney Rodi had conducted with him." According to Detective Egan, Kalish was allowed to do so. Kalish did not appear irritated when Detective Egan met him.

When Rodi left the interview room, she talked with Detective Egan. Five or 10 minutes later, Rodi talked with defendant's attorney, Kalish. Rodi first discovered Kalish was defendant's attorney when Detective Egan told her. Rodi informed Kalish she had a hand-written statement from defendant, and that she was going to go interview Milton. Kalish asked if he could go with her, and Rodi agreed. Kalish had already seen Milton and was present when Milton's statement was reduced to writing; Kalish, Rodi, Detective Gallagher and Milton all signed the statement. According to the statement, the time was 10:55 p.m.

Rodi testified she never denied Kalish the right to meet with defendant. She did not know how long Kalish had been in the police station before she met him, and he did not appear upset or angry.

Detective Gallagher first became aware that an attorney, retained for defendant by defendant's family, was present at the police station after the second interview with defendant. Sergeant Chengary so informed him at approximately 10:15 p.m. Detective Gallagher first saw Kalish sometime between 10:15 p.m. and 10:30 p.m.

The circuit judge made the following finding:

> "I find from listening to the evidence that the defendant did not request to see an attorney either before or during questioning. Whether Kalish was out in the station during the written—during the interrogation which was reduced to writing is unclear. He certainly wasn't there during the time the oral statement was given. But even if he was there during the course of the written interrogation and asked that he would be able to see the defendant I do not think that would invalidate the statement."

## Evidence at Trial

At the time of the trial, defendant, his wife, and their daughter lived in Hyde Park. Defendant's parents, his five sisters and four brothers, lived at 8629 South Cregier. On February 5, 1986, defendant's mother asked defendant to help defendant's brother, Milton, pick up their seven-year-old niece from elementary school. The niece, who lived with defendant's parents, attended Caldwell Elementary School, located a half block from the Griggs residence. At this time, defendant was 21 years old and defendant's brother, Milton, was 22 years old.

As defendant and Milton were accompanying their niece the half block from the Caldwell School to the Griggs residence, an encounter took place between

defendant and Milton and several teenage males. After this encounter, defendant and Milton took their niece to her home. A short time later, defendant took his mother's gun and he and Milton left the house. Another encounter took place between defendant and Milton and the teenage males, after which defendant took the gun and fired several shots, one of which struck and killed Jahnke. After this, defendant and Milton went back into the house. Defendant was arrested a short time later.

Tommy McDaniel and Davin Samuels testified for the State. Tommy was 15 years old and Davin was 14 years old on February 5, 1986. Both were in the eighth grade at the Caldwell School and both lived within two blocks from where the shooting occurred. Tommy had been in school that day, but school had already let out by the time of the shooting. Davin did not attend school that day because his stomach hurt.

Davin's stomach felt better about 1 p.m., so Davin went to his mother's house until 2 p.m. He then went to the 7-11 store, and by 2:30 p.m. walked to a place called Pepe's and met Tommy, Renard Quillan and Joseph Reese. Joseph did not attend Caldwell School; he was older. Tommy stated he was with Davin and Joseph, but was unable to recall the name of the third person, although he was a good friend.

Davin, Tommy, Joseph and Renard were in the vicinity of 8615 South Cregier at around 3:30 p.m. Davin and Tommy testified that defendant and Milton came up to them. According to Tommy, defendant said something to Joseph which Tommy could not recall, and defendant and Joseph almost started fighting. They did not fight because Tommy said something. Defendant and Joseph shook hands. According to Davin, when defendant approached the group, defendant asked which one of the group threw a bottle at him. There was no response. Davin stated Milton wanted to fight him. Davin con-

cluded this because Milton said "mother-fucker" to him. Davin did not respond, he just looked at Milton. A fight did not take place because Davin's friends pulled him away from Milton. Defendant and Milton then walked away and back to the Griggs residence.

Tommy stated that he and the group then went to his "play sister's" house. Tommy's "play sister," Felicia, was not his real sister, but was like a real sister. Felicia was 18 years old. According to Tommy, he and his friends were on the front porch of Felicia's house when defendant and Milton came up to them four or five minutes later. According to Tommy, Milton wanted to fight him. Everyone walked into the street, but no one fought. Defendant and Milton then started walking south on Cregier. Tommy and his friends started walking south on Cregier; they were going to a 7-11 store.

According to Davin, after the first encounter between defendant and Milton and the group, Davin and his friends went to the Caldwell School. School had just let out and there were a lot of kids around. Defendant and Milton walked up to the group on the sidewalk in front of the Caldwell School about five minutes later. Defendant said: "If you all don't quit fucking with my brother, I blow all your fucking heads off." Defendant said Milton wanted to fight Tommy. Milton and Tommy went into the middle of Cregier and were preparing to fight. Davin, Renard and Joseph crossed the street. Milton might have tried to kick Tommy in the knee. Felicia, Tommy's "play sister," came out and broke up the fight. Defendant and Milton then walked away.

When defendant and Milton were halfway to the Griggs residence, Davin and his friends "started walking up toward them." Davin stated that he and his friends were not running or chasing defendant; they were on their way to the 7-11 store. Davin stated that Robert

Carpenter, a friend, and someone else joined the group and started walking with them.

Tommy and Davin and their friends walked past a gas company crew which was working on the east side of South Cregier. According to Tommy, when defendant was in front of his mother's house and Tommy was three houses away, defendant drew a silver gun which looked like a .38, aimed at Tommy and his friends, and started shooting. Tommy said defendant shot one time, then turned and started to run. He heard five or six shots, all in a row.

According to Davin, when he and his friends were about four or five houses away from defendant, he saw defendant stumble or almost slip and then catch himself. Defendant took a gun and aimed it right at Davin and the group. Defendant did not point the gun up in the air. No one said anything to defendant or Milton right before defendant started shooting. Davin went behind a tree and watched defendant shoot the gun four or five times. He ran under a car, and then ran toward the Caldwell School. Davin flagged down some police officers and showed them where he thought defendant lived; he was unaware that anyone had been shot.

Both Tommy and Davin testified that no one but defendant had a weapon. Specifically, no one in the group had a baseball bat or anything in their hands prior to or at the time of the shooting.

Later that day, Tommy identified defendant in a lineup at the police station. Tommy could not recall if he told the police that he was with Renard or Rob, although he knew a Renard Quillan and a Rob Carpenter. Tommy could not recall if he told police that he and Milton got into a fight and that Milton kicked him in the stomach. He did not tell police that Felicia broke up a fight.

Tommy did not tell the police that he followed defendant and his brother after the fight. Tommy denied hav-

ing told the police that defendant aimed the gun in the air and then pointed in Tommy's direction and started firing it.

Tommy specifically denied he had ever harassed the Griggs family for a number of years or had thrown a bottle at Milton approximately a week before the incident. Tommy stated he had, however, heard about a bottle being thrown.

It was stipulated that Tommy had been found delinquent on November 15, 1985, based upon a petition alleging a stolen vehicle, and on February 21, 1986, based upon a theft.

Davin also spoke to the police later that day at the station; Davin viewed a lineup. He did not tell the police about the first encounter with defendant and Milton.

When asked if he belonged to a club, Davin stated that he did. The name of the club was the "MC's." When asked by the defense if the "MC's" were a gang, Davin replied, "Yes." According to Davin, neither Tommy, Joseph, Renard Quillan nor Rob Carpenter belonged to the "MC's." It was stipulated that Davin had been found delinquent on September 15, 1986; the delinquency finding was entered on a robbery petition. Davin did not remember if he told the police that Tommy and Milton were in a fight and that Milton had kicked Tommy in the stomach. While Davin did tell the police that he and his group followed defendant and Milton after they left, he did not say that he and his group chased defendant and Milton. Davin did not see Milton once defendant started shooting.

Sergeant Jeffrey Murphy testified he had arrived at the scene at approximately 3:45 p.m. Sergeant Murphy arrested defendant in defendant's mother's house and removed the gun which defendant had used. Five cartridges of the .38-caliber gun had been expended; one .38-caliber cartridge remained in the gun.

Detective Gallagher testified that he questioned defendant two times on February 5, 1986. He and Detective Egan were present for the first interview, he and Assistant State's Attorney Rodi were present for the second.

Rodi prepared a three-page document at the end of the second interview, which defendant, Detective Gallagher and Rodi signed. Detective Gallagher read the document prepared by Rodi into evidence at trial. The document was not included in the record. The statement indicated that it was taken at 9:30 p.m. The *Miranda* warnings appeared on the top of each page. Detective Gallagher read the following:

> "That on February 5, 1986 at, approximately, 3:15 p.m. Terry and his brother Milton were walking down the street when they ran into about six or seven guys. The six or seven guys started swearing at Terry and Milton. Terry and Milton then get into a physical fight but continued walking home. Once inside Terry got a .38 caliber gun from under his mother's bed and put it in his coat pocket. Then Terry told Milton that he wanted to go outside and talk with the guys on the street. Terry and Milton walked about a block and a half before they ran into the same guys again. Terry approached them and asked to talk to them. Then they agreed to fight one-on-one. Milton and another guy fought but a girl broke it up by telling Terry and Milton that Milton was too old to fight. After the fight Terry and Milton start—Milton started walking home. During the fight Terry didn't see any weapons drawn by anyone. As they were going home Terry turned around and saw the same guys following them at the same pace. When they were, approximately, one house away from their mother's house Terry took the gun out of his jacket and starting firing four times."

Detective Gallagher testified that on February 6, 1986, he had prepared a typed supplementary case report, based on handwritten notes taken during the initial interview of defendant which summarized what defend-

ant said during that interview. Defendant did not sign this summary nor did he adopt it as his statement. According to Detective Gallagher, the contents of the document prepared by Assistant State's Attorney Rodi were substantially the same as the contents of the supplementary case report.

Detective Gallagher was questioned concerning what was meant by the phrase "following [defendant and Milton] at the same pace" which appeared in the document prepared by Rodi. Detective Gallagher stated: "Now if they were walking slow, walking fast, if they started running, whatever they did the group did." Detective Gallagher was also questioned about the supplementary case report. Detective Gallagher acknowledged that in the report it was stated: "We walked away and they began running after us." Detective Gallagher also acknowledged that his report stated: "We started to run but as they got close [defendant] took out the gun and aimed it, firing three or four shots." Detective Gallagher also explained that defendant stated that no physical altercation occurred before defendant went into the house and got the gun. Rather, there was a verbal altercation.

Patrick McPartlin and Jesus Delgadillo both testified for the State. Both men were employed by People's Gas and, together with the victim, Charpel Jahnke, were working at 8615 South Cregier Avenue on February 5, 1986.

McPartlin testified that at approximately 3:45 p.m. he was in a backhoe digger, facing south on Cregier, when Jahnke, on the street side, came to speak with him. The backhoe digger had been and was running. McPartlin was inside an enclosed cab and had to open the door of the backhoe digger to speak with Jahnke. McPartlin turned toward the east, heard sounds like firecrackers, turned back toward the west and saw Jahnke falling down. McPartlin heard two or three or four or five

sounds, but definitely heard three sounds like firecrack-ers.

McPartlin then looked south where he saw two or three individuals approximately 50 to 75 feet away, fac-ing north, above whom was a cluster of smoke. A tall man had a shiny object in his hand. The tall man's arm was extended, and was pointing the shiny object at Mc-Partlin. A short man then tried to pull the tall man's arm. These two men then turned and ran south and east; McPartlin did not see where they went. McPartlin then turned his attention to Jahnke.

McPartlin did not see any of these individuals before and had not noticed any unusual activity in the street prior to the shooting. After the shooting, McPartlin saw "four, five, six, could be seven young black males run-ning around." He did not notice in which direction they were running.

Delgadillo testified that he had been in a hole behind the backhoe digger prior to the shooting. There was a lot of noise due to a compressor and the backhoe digger running. As he came out of the hole, he was facing west and heard shooting; he then saw Jahnke fall down. Delgadillo heard two shots as he was climbing out of the hole and then, about five seconds later, he heard two or three more shots. At this time, Delgadillo saw three per-sons running toward the north in a westerly direction. He then turned south and saw two men running; the two men either ran into a house or past the houses.

Charlena Griggs, defendant's sister, testified for the defense. On February 5, 1986, Charlena lived with her mother at 8629 South Cregier. Charlena was looking out of a window of the second floor of her family's house at around 3:30 p.m. or 3:45 p.m. Charlena testified she heard many loud voices. One particular voice said, "You mother-fucker I told y'all not to come on this street again. I meant to kill you the last time you came."

Charlena then saw her brothers, defendant and Milton, being chased by a group of shouting young men.

Defendant and Milton were running on the sidewalk on the east side of the street, the same side as the Griggs residence. She heard someone yell: "Come back here, you mother fucker. Y'all ain't getting away this time." She saw an object being thrown at Milton. She saw Milton duck to keep from being hit.

Charlena testified that there were 10, maybe more, young males chasing her brothers; some were on the east side of the street and some were on the west side of the street. The male who threw the object was on the west side of the street. Charlena testified that she saw some of the males carrying baseball bats, one had a brick, and another had the object, which Charlena could not identify, which was thrown at Milton. Charlena yelled for someone to call the police and ran downstairs after seeing Milton duck to avoid the object which was thrown at him. At this point, defendant and Milton were a couple of houses down from the Griggs residence, and the group which was chasing them was five or six feet behind defendant and Milton.

Charlena went out on the front porch, where she saw a male pulling defendant from behind. Defendant and Milton were struggling to get away from the group. Milton was next to defendant. Besides the young male who had his hands on defendant, there were other members of the group which had been chasing defendant and Milton "right up on" defendant. Others were a few feet away. Charlena recognized about two of the 10 or so young males who had chased defendant and Milton as persons who lived on her block. She did not know their names. She could not recall whether either of those two was the one who had grabbed defendant because it was all "such [a] blur."

At this point, Charlena saw defendant hold his right arm up in the air. Charlena could not recall which direction defendant faced, nor could she recall what, if anything, defendant had in his hand. Charlena heard several shots at this time, but did not see where those shots came from. Defendant, Milton and Charlena then ran into the house. At this point, Charlena heard two or three noises which appeared to her to be gunshots.

Charlena and her family had lived in their home for five years. Concerning the year before the shooting, Charlena testified that her family had had problems with the gangs in the area where they lived. Charlena related a specific incident in which a family member went to a store and someone threw a bottle at him. This had happened a month or so before the shooting.

Defendant testified on his own behalf. On February 5, 1986, defendant did not live with his parents; he lived in Hyde Park with his wife. Defendant's parents, his five sisters and four brothers lived at 8629 South Cregier. Defendant would visit his mother's house approximately three times a week. Defendant was aware that there were teenage gangs in the neighborhood. In particular, the "Blackstones" gang was active in the area. A large wall at 87th and Cregier, across from a 7-11 store, was covered with gang-related graffiti. Defendant was aware that his family had had trouble with these gangs in the past. Defendant testified that about a week before the shooting, someone had thrown a bottle at his brother's head as his brother was returning from the 7-11 store. Defendant also related that his little sister had been grabbed by a gang member while walking home from a store in the area.

At approximately 3 p.m. on February 5, 1986, defendant's mother asked defendant to go with Milton to pick up their 7-year-old niece, Kyana, from the Caldwell School. Defendant and Milton picked up Kyana, and

when they returned to the Griggs residence, there were about five teenage males standing in front of the house. Defendant testified that the males started calling him and his brother names and stating insulting remarks, including "Y'all punk mother-fuckers, y'all don't belong in this neighborhood because y'all some wimps and y'all not going to be staying around here." Defendant stated that Tommy McDaniel had told Milton, "I threw that bottle at your head last week. I meant to bust your head. Next time I ain't going to miss." Defendant asked the teenagers to leave; they refused, and defendant, Milton and Kyana walked around them and into the house. There was no physical altercation at this time.

Once inside the house, defendant got a gun from under his mother's bed and put it in his coat pocket. The gun was not defendant's. Defendant testified he got the gun to protect himself from gang members who defendant thought might be carrying pistols. Defendant and Milton went back outside. According to defendant, he wished to speak with the teenage males in order to get them to stop harassing his family.

Defendant and Milton went back to the Caldwell School, where the same group he had just spoken to were. Defendant testified he told the group that whatever the group had done in the past could be put behind them because they were in the same neighborhood and they should all try to get along. In response, one of the group insulted defendant and stated: "I'll let my boy go one-on-one with yours. *** I know he is going to kick his ass anyway but after this we'll just quit harassing the family." Present in the group were Tommy McDaniel and Davin Samuels.

Defendant stood a few feet away as Tommy and Milton started fighting on the Caldwell School grounds. After the fight had started, a girl came up to the group and told Milton and defendant that they were too old to

be "fighting these young boys." Defendant testified he tried to break up the fight because defendant and Milton were "not getting anywhere."

After the fight stopped, defendant asked the group if everything was now all right and received no response. Defendant and Milton started walking back to defendant's mother's house. The gun was still in defendant's pocket. As defendant was walking toward the Griggs residence, he saw two guys, who had not been in the group, walk over and join the group. It appeared to defendant that these two males had baseball bats in their hands.

As soon as these two males had joined the group, the group started following defendant and Milton. Soon afterwards, the group started chasing defendant and Milton; defendant and Milton started running. The members of the group started yelling insulting statements at defendant and Milton, and someone yelled, "We going to get y'all now. We not going to wait till later."

Up to this point, defendant had been on the west side of Cregier; defendant then ran across Cregier to the east side, the side on which his mother's house was located. Defendant had not noticed that there was a gas crew working on the east side of Cregier. A couple of the group's members still ran on the west side of Cregier; the rest ran into the street and over to the east side of Cregier. Defendant testified that a member of the group threw something which hit defendant in the foot, almost making him fall. This occurred about a house before defendant's mother's house.

One of the group tried to grab defendant's clothing. At this point, defendant stopped running and tried to push the teenage male away by swinging his arm. Defendant testified he turned around and faced north and saw the boys still chasing him. Defendant testified he was afraid of being killed, and he took the gun out of

his pocket with his right hand. Defendant pointed the gun almost straight up in the air and started firing it. Defendant did not know how many times he fired the gun; it could have been two, three or four shots. Defendant never fired shots directly at the group. At this time, defendant testified, he was not trying to shoot anyone, he was not trying to kill the teenagers who were chasing him, and he did not see Jahnke.

Milton ran off to defendant's side. Defendant then ran into the house and gave the gun to his mother. Defendant was unaware at this time that anyone had been shot, but found out this information about 10 minutes later.

On cross-examination, defendant testified that he had first told the police about the individuals with the baseball bats at the police station that night. Defendant acknowledged that this information was not in the statement, signed by him, which had been written down by Assistant State's Attorney Rodi. Defendant also acknowledged that Tommy McDaniel's statement to Milton concerning the thrown bottle was not in the statement. According to defendant, at the time he was being questioned, he was "not thinking of all these things at the police station."

Detective Egan testified for the defense as an impeachment witness. Detective Egan interviewed Tommy McDaniel at the police station on February 5, 1986. Tommy told Detective Egan he had been with Joseph Reese, Davin Samuels, Renard Quillan, and a person named Rob. Detective Egan stated that Tommy told him that when defendant took out the gun, defendant first aimed the gun up in the air.

Detective Egan also interviewed Joseph Reese. Detective Egan testified that Joseph Reese stated he and his group started chasing defendant and his brother. Detective Egan could not recall whether Tommy specifically

stated that he and his group were chasing defendant and Milton. According to Detective Egan, Tommy told essentially the same story as Joseph Reese. Detective Egan stated that Davin Samuels told him that a fight had occurred. Detective Egan stated that he had been told that one of the parties in the fight had been kicked in the stomach.

## Analysis

### I

Defendant argues it was error for the circuit court to deny his motion to suppress. Defendant argues that *People v. Smith* (1982), 93 Ill. 2d 179, requires police to inform a suspect during custodial interrogation that counsel, appointed or retained to assist the suspect, is present and seeking to consult with him in order for a waiver of the suspect's rights to be knowingly and intelligently made.

In *Smith*, the court held:

"[W]hen police, prior to or during custodial interrogation, refuse an attorney appointed or retained to assist a suspect access to the suspect, there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him." (*Smith*, 93 Ill. 2d at 189.)

Defendant points out that the holding in *Smith* was based upon the suspect's right to counsel during custodial interrogation: "That right stems from the fifth amendment protection against self-incrimination." *Smith*, 93 Ill. 2d at 185.

The State argues that *Smith* was wrongly decided and should be overruled. The State contends that *People v. Holland* (1987), 121 Ill. 2d 136, and *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, are dispositive of the issue whether defendant's constitutional rights were knowingly waived. In *Burbine*, the Su-

preme Court held that the fifth amendment does not prohibit police from refusing or failing to inform a suspect of an attorney's effort to reach him.

In *Holland,* this court found it not to be error for the police to fail to inform a suspect, unaware of the fact that a relative had secured counsel for the suspect, that counsel had telephoned police regarding the suspect. The State contends that this court adopted the holding of *Burbine* in *Holland* and argues that *Burbine* overruled *Smith sub silentio.*

This court saw no need to overrule *Smith* when it decided *Holland,* and we see no need to do so now. The court distinguished *Smith* in *Holland* because of factual differences between the two cases. (See *Holland,* 121 Ill. 2d at 153.) In *Holland,* there was simply no evidence presented at the hearing on the motion to suppress to suggest that the attorney had ever requested access to his client. Since there was no evidence that the attorney requested access to the client, there could have been no wrongful denial of attorney access and no reason to apply the rule of *Smith* to the facts presented in *Holland.* The court therefore declined the invitation of the defendant in *Holland* to apply the rule in *Smith,* and applied the standard set forth in *Burbine.* If the facts of *Holland* were to come before this court today, we would reach the same decision: Where a suspect is unaware that an attorney has been retained for him, and where there is no evidence presented of a denial of attorney access, an otherwise valid waiver of constitutional rights will be upheld.

In *Burbine,* the police told an attorney, retained by the defendant's sister without the defendant's knowledge, that the defendant, who was in custody, would not be questioned that day. The police failed to inform the suspect of the attorney's efforts to reach him and questioned the defendant. The defendant "on three separate

occasions *** signed a written form acknowledging that he understood his right to the presence of an attorney and explicitly indicating that he '[did] not want an attorney called or appointed for [him]' before he gave a statement." (*Burbine*, 475 U.S. at 417-18, 89 L. Ed. 2d at 418, 106 S. Ct. at 1139.) Three written statements, signed by the defendant fully admitting the crime with which he had been charged, resulted from the questioning. The Supreme Court upheld the denial by the trial court of a motion to suppress the statements.

The State argues that *Burbine* is dispositive of the issue whether the withholding of information from a suspect in custody, who knows that an attorney is being retained for him by his family, that an attorney is immediately available and seeking access to him is a violation of that suspect's rights.

*Burbine* is not dispositive, as it is factually distinguishable. In *Burbine*, the suspect did not know that an attorney had been retained for him. It is alleged in the case at bar that defendant knew a family member had retained an attorney for him. The *Smith* court considered persuasive the opinions of other States which have "suppressed statements obtained after police have foiled an attorney's efforts to consult with a client." (*Smith*, 93 Ill. 2d at 188, citing *State v. Matthews* (La. 1982), 408 So. 2d 1274; *Commonwealth v. McKenna* (1969), 355 Mass. 313, 244 N.E.2d 560; *Commonwealth v. Hilliard* (1977), 471 Pa. 318, 370 A.2d 322; *State v. Jones* (1978), 19 Wash. App. 850, 578 P.2d 71.) After *Smith* was decided and before *Burbine*, several States determined that failure to inform a suspect of an attorney's efforts to consult with him would be constitutional error. *Commonwealth v. Sherman* (1983), 389 Mass. 287, 450 N.E.2d 566; *Lewis v. State* (Okla. Crim. App. 1985), 695 P.2d 528.

Since *Burbine* was decided, several States have found the failure or refusal of police to inform a suspect of an attorney's attempt to provide counsel to the suspect rendered invalid a waiver of the suspect's rights under the State constitution. *State v. Stoddard* (1988), 206 Conn. 157, 537 A.2d 446; *Bryan v. State* (Del. 1990), 571 A.2d 170 (*reaffirming pre-Burbine* ruling in *Weber v. State* (Del. 1983), 457 A.2d 674); *Haliburton v. State* (Fla. 1987), 514 So. 2d 1088; *Roeder v. State* (Tex. Crim. App. 1988), 768 S.W.2d 745 (*reaffirming pre-Burbine* ruling in *Dunn v. State* (Tex. Crim. App. 1985), 696 S.W.2d 561).

The *Smith* court deemed *State v. Haynes* (1979), 288 Or. 59, 602 P.2d 272, "persuasively relevant." (*Smith*, 93 Ill. 2d at 186.) In *Haynes* is found language, which has been quoted repeatedly by other State courts and by this court in *Smith*, which bears repeating:

> " '[W]hen unknown to the person in this situation an identified attorney is actually available and seeking an opportunity to consult with him, and the police do not inform him of that fact, any statement or the fruits of any statement obtained after the police themselves know of the attorney's efforts to reach the arrested person cannot be rendered admissible on the theory that the person knowingly and intelligently waived counsel.' 288 Or. 59, 70, 602 P.2d 272, 277.

The court reasoned:

> 'It is not disputed that an arrested person has a right to have access to counsel when taken into custody and thereafter, subject only to the practical necessities of custody that may temporarily prevent immediate communication with counsel. We know nothing in Oregon law, nor did counsel for the state when asked, that would authorize the police to prevent or delay communication between an arrested person and a lawyer who is, or who is asked to become, that person's attorney. Certainly nothing of the kind follows

from the simple fact of an arrest.' 288 Or. 59, 70-71, 602 P.2d 272, 277.

'To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. *** We do not hold *** that this decision can be made only in the attorney's presence, although in practice this would obviate the recurring problems of proof that have been mentioned. But we agree *** that when law enforcement officers have failed to admit counsel to a person in custody or to inform the person of the attorney's efforts to reach him, they cannot thereafter rely on defendant's "waiver" for the use of his subsequent uncounseled statements or resulting evidence against him. We believe this rule protects the suspect's right under [the State constitution] and the federal fifth and 14th amendments not to testify against himself ***.' 288 Or. 59, 72-74, 602 P.2d 272, 278-79 [*reaffirmed post-Burbine in State v. Isom* (1988), 306 Or. 587, 593, 761 P.2d 524, 527]." *Smith*, 93 Ill. 2d at 187-88.

We do not consider that police interference with an attorney's access to a client has "no bearing on [a defendant's] capacity to comprehend and knowingly relinquish a constitutional right." (*Burbine*, 475 U.S. at 422, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141.) Since we do not deem constitutionally irrelevant police interference with an attorney's access to a client, we do not agree that a waiver so obtained may be said to have been "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141.

There is a valid distinction to be made between failure to provide generally useful information and "affirm-

ative police interference in a communication between an attorney and a suspect [when the information withheld by the police] bears directly on the right to counsel that police are asking the suspect to waive." *Burbine*, 475 U.S. at 456 n.42, 89 L. Ed. 2d at 443 n.42, 106 S. Ct. at 1159 n.42 (Stevens, J., dissenting).

In the case at bar, if defendant's attorney were present at the stationhouse during the interrogation of defendant, before defendant signed the statement written by the assistant State's Attorney, then requiring the police to have specifically informed defendant of the attorney's immediate availability in no way would have required the police to supply a "flow of information" designed to help the defendant "calibrate his self-interest." (*Burbine*, 475 U.S. at 422, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141.) As the *Smith* court recognized, not requiring the police to so inform a suspect would "permit police to isolate a suspect from his counsel and regulate or determine what information or advice a suspect is to receive." *Smith*, 93 Ill. 2d at 190.

By reaffirming this court's holding in *Smith*, we are not recognizing a right on the part of the attorney "to invoke the personal right of the suspect to advice and presence of counsel. [Citations.] This *** misunderstands the underlying premise of requiring the police to inform a suspect of the efforts of counsel. *** We are unwilling, however, to dismiss counsel's efforts to communicate as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice whether he or she will invoke the right to counsel." (*Stoddard*, 206 Conn. at 167-68, 537 A.2d at 452-53.) The critical question is whether a suspect has knowingly and intelligently waived his rights. *Smith* holds that "there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him." (*Smith*, 93 Ill. 2d at 189.)

The suspect is, of course, at liberty to decline to have counsel present during interrogation once he is informed that counsel is "present and seeking to consult with him." *Smith*, 93 Ill. 2d at 189.

We hold that a suspect's waiver of his right to counsel is invalid if police refuse or fail to inform a suspect who knows that an attorney has been retained for him of the efforts of the attorney, present at the place of interrogation, to render assistance to the suspect. To hold to the contrary would be to condone "affirmative police interference in a communication between an attorney and a suspect." *Burbine*, 475 U.S. at 456 n.42, 89 L. Ed. 2d at 443 n.42, 106 S. Ct. at 1159 n.42.

The circuit court determined that defendant did not once ask for a lawyer. The circuit court considered the testimony of Detectives Gallagher and Egan and Assistant State's Attorney Rodi on this issue to be more credible than the testimony of defendant. Such a determination will not be overturned or reversed unless it is manifestly erroneous. (*People v. Adams* (1989), 131 Ill. 2d 387, 400.) We decline to disturb the circuit court's decision on this issue.

The circuit court determined it was unclear whether defendant's counsel, Kalish, was present at the police station and had requested to see defendant before defendant signed the statement prepared by the assistant State's Attorney. The circuit court, however, considered that such determination was irrelevant to its decision to deny defendant's motion to suppress.

We remand the cause to the circuit court for a new hearing on defendant's motion to suppress. The circuit court shall make a determination whether (1) defendant knew that an attorney was being retained for him, and (2) whether the attorney retained for defendant was present at the police station before the interrogation of defendant was completed. If the circuit court determines

the attorney retained for defendant was present at the police station before the interrogation of defendant was completed, the circuit court shall determine whether the attorney had requested access to his client before the interrogation of defendant was completed and whether defendant was so informed. If the circuit court finds that defendant knew that an attorney was being retained for him, that the attorney was present and had requested access to defendant before the completion of the custodial interrogation of defendant, and that police refused to so inform defendant of the immediate availability of his attorney, the circuit court shall allow defendant's motion to suppress and set a date for a new trial. Under these circumstances, there would have been no knowing waiver of defendant's constitutional right against self-incrimination. *Smith*, 93 Ill. 2d at 189.

The State argues that the introduction of defendant's statement was harmless beyond a reasonable doubt because the circuit court did not specifically consider the statement in finding defendant guilty and the remaining evidence of defendant's guilt was overwhelming. We disagree. The circuit court specifically admitted the evidence over objection. The central factual question to be decided by the circuit court in this bench trial was whether or not defendant was firing the gun in self-defense. Defendant testified at trial that he was being chased by a gang, at least some of whose members had baseball bats. Defendant also testified that an object was thrown at him by one of the members of the gang. The State was able to use the fact that defendant did not include this information in the statement he signed as impeachment of his trial testimony.

The fact that Detective Gallagher referred to statements made by defendant during the initial interview does not change this result. Although Detective Gallagher testified that the statement, written by Assist-

ant State's Attorney Rodi and signed by defendant, was substantially the same as the statements summarized in Detective Gallagher's supplementary case report, the evidence shows otherwise, we do not have available to us either the statement written by Assistant State's Attorney Rodi or the supplementary case report or the handwritten notes on which the report was based, but Detective Gallagher's testimony shows that the two are not substantially the same.

The supplementary case report indicates that defendant stated that there was a verbal altercation, not a physical confrontation, between defendant and Milton and one of the group members before defendant went into his mother's house, got the gun and came back out. The written statement indicates that defendant and Milton engaged in a physical fight before defendant went inside and returned with the gun. The supplementary case report stated that defendant and Milton "walked away and they began running after us." The written statement indicates only "Terry turned around and saw the same guys following at the same pace." Clearly, then, the written statement did not merely duplicate the contents in the supplementary case report.

We cannot find beyond a reasonable doubt that this did not affect the outcome of the trial. Neither do we consider it significant that in this case it was the exclusion from the statement of exculpatory evidence, and not the inclusion in the statement of incriminating evidence, which was used against defendant.

## II

Count II of the indictment returned by the grand jury charged defendant with murder in violation of section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)) "in that he, without lawful justification shot and killed Charpel Jahnke with a hand-

gun knowing that such shooting with a handgun created a strong probability of death or great bodily harm to Charpel Jahnke."

On the day of trial, the State successfully moved to amend count II to read: "[s]hot and killed Charpel Jahnke *or another*." (Emphasis added.) We note that the appellate court, in its order, incorrectly referred to the language of count I in its discussion of this issue. Count I, charging defendant with a violation of section 9—1(a)(1), was not amended; it was dismissed on a motion by defendant for lack of evidence. Count III, charging defendant with armed violence, was also dismissed on a motion by defendant.

Amendments to indictments are allowed where the defect in the charge is a matter of form. "An indictment *** may be amended on motion by the State's Attorney or defendant at any time because of formal defects, including *** (f) The use of alternative or disjunctive allegations as to the acts, means, intents or results charged." Ill. Rev. Stat. 1985, ch. 38, par. 111—5(f); see *People v. Jones* (1973), 53 Ill. 2d 460, 462; *People v. Coleman* (1971), 49 Ill. 2d 565, 569-70.

Defendant argues that the amendment of count II to read "Charpel Jahnke *or another*" (emphasis added) was substantive and not a formal charge. Any attempt to broaden the scope of the indictment, alter or change the offense charged, or change a material element of the indictment requires return of the indictment to the grand jury. *People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 1027.

The circuit court specifically found that the amendment was to cure a formal, not a substantive, defect, and stated "that [the amendment] does not change the charge, it would not change the defense and did not change the defense." Defendant was put on notice before trial of the nature of the charge against him.

Defendant's theory of defense, self-defense, did not change with the amendment of count II of the indictment to add the disjunctive "or another." We conclude the circuit court did not err in refusing to return the indictment to the grand jury.

## III

Defendant argues that the State failed to prove, beyond a reasonable doubt, that he was not justified in using force likely to cause death or great bodily harm. Defendant also argues that he is only guilty of voluntary manslaughter because he was prompted to kill by a sudden and intense passion provoked by the teenage males.

We have thoroughly reviewed the evidence produced at trial. There were conflicting versions of what happened at 8416 South Cregier on the afternoon of February 5, 1986. The circuit court chose to believe the version presented by the State. This version, if accepted, supports the State's charge that defendant was guilty of murder. *People v. Slim* (1989), 127 Ill. 2d 302, 307.

Defendant's motion to strike a part of the State's argument, taken with the case, is denied.

For the foregoing reasons, we reverse the judgment of the appellate court and remand the cause to the circuit court for proceedings not inconsistent with this opinion.

*Appellate court judgment reversed;*
*cause remanded.*

JUSTICE CLARK, specially concurring:

The court today adopts a narrow rule of law: "We hold that a suspect's waiver of his right to counsel is invalid if police refuse or fail to inform the suspect who knows that an attorney is being retained for him of the efforts of the attorney, present at the place of interrogation, to render assistance to the suspect." (152 Ill. 2d at

29.) The court reaches this conclusion by reaffirming this court's decision in *People v. Smith* (1982), 93 Ill. 2d 179, and distinguishing *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, and *People v. Holland* (1987), 121 Ill. 2d 136.

In my view the majority's opinion is unclear whether it reaches its conclusion based upon State or Federal constitutional principles. I believe that under the present circumstances both constitutions support the majority's decision. I write only to reassert my position, expressed in *Holland,* that our State's constitutional protections prohibit the police conduct here at issue.

In *Holland,* I expressed my view that the Illinois Constitution provides distinct protection to a defendant against self-incrimination and that this State protection includes the right to speak with counsel who is attempting to reach his or her client. (*Holland,* 121 Ill. 2d at 164 (Clark, C.J., specially concurring).) I also noted that the *Holland* majority opinion was unclear as to the basis for its holding:

> "As I understand the majority's opinion, it holds either: (1) that the constitutional guarantee against self-incrimination contained in our State Constitution does not prohibit the police from denying an attorney access to his client, or (2) that our State Constitution prohibits only the denial of access to an attorney who is actually present at the site of interrogation, but not to an attorney who merely telephones the station house." (*Holland,* 121 Ill. 2d at 166 (Clark, C.J., specially concurring).)

Additionally, I noted that State due process concerns may be implicated when police fail to inform a suspect that his attorney is trying to reach him:

> "Courts have viewed with suspicion efforts to prevent lawyers from meeting with their arrested clients, even where the client has not formally invoked his right to meet with the lawyer. In fact, continued interrogation of a client who has not been informed of his attorney's con-

temporaneous efforts to meet with him has been nearly universally condemned.

\* \* \*

Such interrogation conflicts with an adversarial system of justice. It offends against traditional notions of justice and fair play." *Holland*, 121 Ill. 2d at 166 (Clark, C.J., specially concurring).

Although we recently declined in *People v. Perry* (1992), 147 Ill. 2d 430, which I authored, to read our State constitutional protection against self-incrimination more liberally than that of its Federal counterpart, the issue posed by *Perry* presented very different constitutional concerns. In *Perry* the question before us was whether a defendant's acceptance of the assistance of counsel at an arraignment constituted an invocation of his rights under article I, section 10, of the Illinois Constitution of 1970. As we recognized in *Perry*, in appropriate cases this court has the obligation to interpret our State Constitution more liberally than similar provisions of the Federal Constitution. (147 Ill. 2d at 436; accord *People v. Tisler* (1984), 103 Ill. 2d 226, 258 (Clark, J., specially concurring).) I believe this to be such a case.

CHIEF JUSTICE MILLER, dissenting:

I do not agree with the majority that a new hearing must be held on the defendant's motion to suppress. The defendant's *Miranda* waivers were, in my view, valid and complete when made, and thus his confessions were properly admitted against him at trial.

I believe the present appeal is controlled, as a matter of Federal constitutional law, by the Supreme Court's decision in *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135. In that case the Court determined, among other things, that a defendant's waiver of his *Miranda* rights was valid even though the interrogating officers failed to inform the suspect that an attor-

ney retained on his behalf was trying to contact him. The Court rejected the defendant's contention that his waiver was rendered unknowing because he was not told about counsel's efforts to reach him.

Thus, whether or not possession of this information might make a practical difference to a suspect, it does not make a constitutional difference, and police officers are not obligated by *Miranda* to provide the information to suspects. The *Burbine* Court explained:

> "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. Under the analysis of the Court of Appeals, the same defendant, armed with the same information and confronted with precisely the same police conduct, would have knowingly waived his *Miranda* rights had a lawyer not telephoned the police station to inquire about his status. Nothing in any of our waiver decisions or in our understanding of the essential components of a valid waiver requires so incongruous a result. No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. [Citations.] Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Burbine*, 475 U.S. at 422-23, 89 L. Ed. 2d at 421-22, 106 S. Ct. at 1141.

In addition, the actions of the police in this regard have no bearing on the knowing or voluntary nature of the suspect's waiver of his right to counsel. *Burbine* states:

"[W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident. [Citation.]" *Burbine*, 475 U.S. at 423, 89 L. Ed. 2d at 422, 106 S. Ct. at 1142.

As *Burbine* makes clear, the validity of an individual's waiver of his *Miranda* rights does not depend on the efforts of others to obtain counsel for the suspect, on the attempts by retained counsel to meet with the suspect, or on the conduct of the police in failing to apprise the suspect of retained counsel's presence at the station house. Pronouncements of Federal constitutional law by the United States Supreme Court are, of course, binding on this court, and we are not free to grant greater rights under the United States Constitution than the Supreme Court has chosen to do. (*Oregon v. Hass* (1975), 420 U.S. 714, 719 & n.4, 43 L. Ed. 2d 570, 575-76 & n.4, 95 S. Ct. 1215, 1219 & n.4; *In re Estate of Karas* (1975), 61 Ill. 2d 40, 53.) For these reasons, I believe that *Burbine* is dispositive of the present defendant's Federal constitutional contention that his *Miranda* waivers were invalid.

*Burbine* notwithstanding, the majority relies on a Federal constitutional interpretation first adopted by this court in *People v. Smith* (1982), 93 Ill. 2d 179, a decision predating *Burbine*, and later preserved and narrowed by this court in *People v. Holland* (1987), 121 Ill. 2d 136, *aff'd on other grounds* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803, a decision postdating *Burbine*. The majority would distinguish *Burbine* on the ground that the defendant in the present case, unlike the defendant in *Burbine*, already knew that counsel was being retained to represent him. (152 Ill. 2d at 25.) The

majority also finds it significant that the attorney in the present case appeared at the station house where the defendant was being held. (152 Ill. 2d at 28.) The majority concludes that a suspect's waiver of the right to counsel is unknowing, and hence invalid, "if police refuse or fail to inform a suspect who knows that an attorney has been retained for him of the efforts of the attorney, present at the place of interrogation, to render assistance to the suspect." (152 Ill. 2d at 29.) The majority's rule is applicable even though the suspect has not previously asked to consult with an attorney.

The grounds on which the majority seeks to distinguish *Burbine* cannot withstand scrutiny. The distinction drawn between suspects who are aware that attorneys have been retained to represent them and suspects who lack that awareness is simply illusory. The majority fails to explain why a suspect's waiver in these circumstances must be deemed less knowing, less intelligent, or less voluntary merely because he already knows that counsel has been retained on his behalf. If a suspect's knowledge in this regard is relevant at all, it argues for the contrary conclusion: it would seem that a defendant who is aware that counsel has been retained to represent him yet chooses anyway to respond to questions has made a more knowing, more intelligent, and more voluntary waiver of his *Miranda* rights than a suspect who lacks that knowledge.

The majority's additional ground by which it would justify its departure from *Burbine*—that the attorney must actually appear at the station house where the defendant is being held—misapprehends the nature of the right at issue. I fail to see why a defendant's assertion or waiver of his right to counsel should be at all dependent on the actions of counsel, and on whether or not the attorney happens to show up at the same place where the defendant is then being questioned.

The majority's rule will be difficult to apply, and will serve only to "muddy[ ] *Miranda*'s otherwise relatively clear waters" (*Burbine*, 475 U.S. at 425, 89 L. Ed. 2d at 423, 106 S. Ct. at 1143). To ensure that an attorney's efforts to reach a client do not go unheeded, police officers will now be obligated to monitor more closely the comings and goings of station house visitors. Moreover, in an addendum to the *Miranda* warnings, interrogating officers must now ask suspects if they know whether counsel has been retained on their behalf. Only through these means will law enforcement officers be able to comply with the majority's mandate.

Finally, the majority's rule will disturb the balance carefully struck in *Miranda* and its progeny between the legitimate use of police questioning as an effective tool of law enforcement and the potential misuse of the interrogation process to obtain coerced confessions. (See *Burbine*, 475 U.S. at 426-27, 89 L. Ed. 2d at 424-25, 106 S. Ct. at 1143-44.) "*Miranda* attempted to reconcile these opposing concerns by giving the *defendant* the power to exert some control over the course of the interrogation." (Emphasis in original.) (*Burbine*, 475 U.S. at 426, 89 L. Ed. 2d at 424, 106 S. Ct. at 1143.) Toward that end, a defendant's invocation of the *Miranda* right to counsel is zealously protected. If a suspect requests counsel, interrogation must cease immediately, and questioning may not later be reinitiated except at the defendant's request. (*Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880; *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093 (barring police-initiated interrogation on second, unrelated offense if suspect has previously requested counsel).) Indeed, police may not reinitiate interrogation outside counsel's presence even though the suspect has been allowed to consult with counsel in the meantime, before the subsequent round of interrogation. (*Minnick v. Mis-*

*sissippi* (1990), 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486.) In light of the substantial protections afforded a suspect who chooses to invoke his right to counsel, I do not believe that a rule different from the one adopted in *Burbine* should apply to a suspect who is aware that an attorney has been retained on his behalf but who does not ask to speak with counsel.

As a final matter, I do not believe that the Illinois constitutional privilege against self-incrimination (Ill. Const. 1970, art. I, §10), on which the majority does not rely, would compel a different result. Neither the defendant nor the author of the special concurrence (152 Ill. 2d at 33-35 (Clark, J., specially concurring); see also *People v. Holland* (1987), 121 Ill. 2d 136, 170-72 (Clark, C.J., specially concurring)) identifies any provision or statement in the text or history of the Illinois privilege that would argue for a more expansive prophylactic rule. *Burbine* fully protects a suspect's interests against compelled self-incrimination, as I have stated, and these same considerations would support its adoption as a matter of State constitutional law as well.

In sum, today's decision cannot be reconciled with *Burbine*. Rather than continue to perpetuate the doctrine adopted, pre-*Burbine*, in *People v. Smith* (1982), 93 Ill. 2d 179, and later preserved, post-*Burbine*, in *People v. Holland* (1987), 121 Ill. 2d 136, *aff'd on other grounds* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803—a doctrine that understandably has led our appellate court, in considering this issue, to wrongly conclude that the validity of a defendant's *Miranda* waiver depends on "what type of contact the attorney made with the authorities" (*People v. Johnson* (1991), 212 Ill. App. 3d 9, 12)—I would instead decide the present appeal under *Burbine*, the controlling Federal authority.

JUSTICE HEIPLE joins in this dissent.