1999 OK CR 23

**Joseph Jerome DENNIS, Appellant**

v.

**STATE of Oklahoma, Appellee**

**No. F–97–1220.**

Court of Criminal Appeals of Oklahoma.

May 6, 1999.

**5.** 20 O.S.1991, § 3001.1; *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).

Richard L. Weldon, Weldon & Smith, Chickasha, Oklahoma, Attorney for Defendant at trial.

Gene Christian, District Attorney, Bret T. Burns, Assistant District Attorney, Chickasha, Oklahoma, Attorneys for State at trial.

Mark P. Hoover, Appellate Defense Counsel, Norman, Oklahoma, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Steven E. Lohr, Assistant Attorney General, Oklahoma City, Oklahoma, Attorneys for Appellee on appeal.

CHAPEL, Judge:

¶ 1 Joseph Jerome Dennis was tried by jury and convicted of First Degree Murder

in violation of 21 O.S.1991, § 701.7(A), in the District Court of Grady County, Case No. CF–96–112. In accordance with the jury's recommendation, the Honorable James Winchester sentenced Dennis to life imprisonment without the possibility of parole. Dennis appeals this conviction and sentence and raises two propositions of error.

¶ 2 On Monday, April 15, 1996, Dennis went to Don's Friendly Auto in Chickasha. Mark Rogers, a mechanic, had been working on Dennis's girlfriend's car for several weeks. Rogers had done other auto work for Dennis and had sold him a car recently. Witnesses saw Dennis and Rogers arguing the preceding Friday and Saturday. After the Friday argument, Dennis told another mechanic that if Rogers gave him trouble he'd "cap him in the forehead." As Dennis and that mechanic bent over his car engine, a .45 Glock semi-automatic pistol fell out of Dennis's jacket.

¶ 3 According to Dennis's confession, on April 15 th Rogers refused to continue working on his girlfriend's car. Dennis pulled his gun but did not point it and told Rogers not to make him do this, to fix his car. Rogers grabbed the gun and it went off. The bullet entered Rogers's forehead between his eyes, killing him instantly; it apparently then went through a wall clock and the metal building wall and landed well away from the building, where police later found it. Dennis drove away in Rogers's car, returned and pulled the garage doors shut, drove away again, returned and left the car. Witnesses saw him drive the car and close the doors.

¶ 4 Dennis was questioned on April 17 th and 18 th and twice on May 1 st. Each time he received Miranda[1] warnings and waived his rights. During the first three interviews he denied any involvement and suggested names of other people who might have killed Rogers. On May 1 st police picked him up at his girlfriend's apartment. Before they left, Ms. Hodge–Sanchez said "they" would not talk to police without talking to a lawyer. Dennis said something like, "Yeah, we would." However, Dennis told officers he did not need a lawyer and would talk with them, and went to the police station voluntarily. Before the interview began he was allowed to sit in the reception room for twenty or thirty minutes talking to Hodge–Sanchez and his mother. The women discussed getting an attorney, and Dennis said again that he had nothing to hide, did not need a lawyer, and would talk to police. During the interview, he waived his Miranda rights and denied any knowledge of the crime. After Captain Bray demonstrated his theory of the crime by poking Dennis in the head, Dennis yelled for police, claimed this was a "racial thing", and asked for an attorney. Bray responded that was fine, he could not talk to Dennis any more, and Dennis was going to jail because too many people put him at the scene. As Bray left the room, Dennis called him back and said he had nothing to hide, did not need a lawyer, and would talk to police. After Officer Adams told Dennis he knew Dennis had owned and sold a .45 Glock semi-automatic pistol, Dennis changed his story. He was again warned and waived his Miranda rights, and told Captain Bray and Adams the story above. This portion of the interview was taped.

¶ 5 While Dennis was confessing, Ms. Hodge–Sanchez hired attorney Richard Weldon on Dennis's behalf. Weldon called the station and demanded to speak with Dennis. Police referred the request to Assistant District Attorney Bret Burns, who was present at the police station. Burns refused to allow Weldon to see Dennis until after he had been charged and booked, as Dennis had neither requested an attorney nor hired Weldon. Weldon telephoned District Judge Van Dyck for assistance; officers told Judge Van Dyck that Weldon was not Dennis's counsel since Dennis had not requested counsel or personally retained Weldon. Weldon then went to the station where he was refused access.

¶ 6 In Proposition I Dennis claims that he invoked his right to counsel while in custody of the Chickasha police detectives, so any statement made by him should have been suppressed as a product of police-initiated questioning. Dennis mistakenly asserts that he invoked his right to counsel on May 1 st, while still at Hodge–Sanchez's apartment, when he said something like, "Yeah,

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

we would," after Hodge–Sanchez said they would only talk to police after talking to a lawyer. His entire proposition depends on this Court's agreement that this extremely vague statement invoked his right to counsel. This statement does not even reach the level of an ambiguous request for counsel, and, of course, police are not required to stop questioning when faced with an ambiguous request.[2] Dennis inexplicably claims police impermissibly initiated conversation after this statement. He admits that, before leaving the apartment, Dennis told officers he had nothing to hide, did not need an attorney, and would talk with them. Once at the station, he twice waived his right to an attorney.

¶ 7 Dennis claims he was in custody when he was taken in for questioning. He points to the unusual number of uniformed policemen who went to Hodge–Sanchez's apartment and speculates that, although the record is silent, Dennis "surely must have felt compelled to go with them."[3] He admits officers testified Dennis was free to leave but does not mention that Detective Adams told Dennis before the interview he was free to leave but it would not be in his best interest. He points to Captain Bray's testimony that he knew Dennis had committed the crime and suggests that the detectives' intent was to question Dennis until he confessed. Even if this is true, it does not mean Dennis was in custody when he was taken to the station. As he admits, the issue is not the officers'

intentions, but whether a reasonable person in Dennis's place would have thought he was free to leave.[4] Dennis also supports this claim with the "facts" that Captain Bray poked him during a demonstration of the crime and Dennis yelled for police. Whether or not Dennis felt he was free to leave during the interview at the station, these facts can have no bearing on his feeling regarding his position *at the time he was taken in for questioning*, as they had not then occurred.[5]

¶ 8 Dennis did not invoke his right to counsel while at his girlfriend's apartment. The record does not support his claim that he was in custody when taken to the police station. Even if he were, he explicitly twice waived his *Miranda* rights and also twice told police that he did not need an attorney and would talk to them. The trial court did not abuse its discretion in failing to suppress Dennis's May 1, 1996 statements. This proposition is denied.

¶ 9 In Proposition II Dennis claims the trial court erred in failing to grant the motion to suppress his statements because he should have been informed his attorney was present and available to consult with him. Dennis claims that while he was in the interview room confessing, an attorney retained for him was just outside the door, loudly demanding to see him. In *Lewis v. State*,[6] decided in 1984, this Court held a *Miranda* waiver is not voluntary where a defendant is not told counsel is present. Relying on the

---

**2.** *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). Dennis suggests that because this statement was not challenged at trial, "it must be regarded as a request for counsel." [Appellant's Br. at 9] He does not say why.

**3.** Appellant's Br. at 11.

**4.** *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Dennis suggests his case is similar to *Williams v. State*, 673 P.2d 164 (Okl.Cr.1983), where the defendant was in custody although he was questioned at his own house. There, the defendant reported the crime to police, waived his *Miranda* rights but then asked for an attorney, was subsequently questioned without reinitiating conversation, and was not free to leave. *Williams* turned on whether, under these ambiguous circumstances, the waiver was voluntary. Here we need not presume

waiver from a silent record. The record clearly shows Dennis was informed of his rights, waived them, and reinitiated contact with officers after the only occasion on which he explicitly asked for an attorney.

**5.** When Dennis asked for an attorney, Captain Bray stopped questioning but said Dennis would go to jail as a material witness. The State wastes several pages unnecessarily defending this statement. In fact Dennis was not arrested as a material witness; he was arrested for the crime of murder. Thus his "arrest" under the material witness statute was not only not "proper", it did not happen. [State's Br. at 13] Dennis does not suggest that Captain Bray's statement tainted or coerced Dennis's subsequent reinitiation and confession. The record would not support such a claim.

**6.** 1984 OK CR 93, 695 P.2d 528.

Oklahoma Constitution, the Court reasoned that a defendant cannot knowingly and intelligently waive his rights to counsel and against self-incrimination where he does not know that retained counsel is present and ready to consult with him before he waives his rights.[7] This is true even though the attorney was hired by others acting on the defendant's behalf without his knowledge.[8] The Court noted that an attorney has no right to see a client, but could not find that an accused knowingly and intelligently waived his rights "when it was not made known to him that his lawyer was, in effect, knocking at the jailhouse door."[9] We recognized that a suspect may very well refuse to see an identified attorney and may waive his rights after knowing an attorney is available.[10] However, we reasoned that he cannot knowingly waive his state rights to counsel and against self-incrimination when he is not informed a specific attorney is trying to reach him in order to consult about those very rights.[11] Without holding police deception was required to create a constitutional violation, we noted with disfavor that there was some evidence that Lewis's attorney was purposefully kept from his client.[12]

¶ 10 In *Moran v. Burbine*,[13] the United States Supreme Court reached the opposite conclusion. That 1986 decision held the *federal* constitution does not require police to inform a defendant who has not requested an attorney that one is present, reasoning that a defendant's ability to make a voluntary waiver should not be affected by developments of which he knows nothing. The *Burbine* Court noted that some states chose to interpret their own statutes or constitutions more broadly and limited its holding to the Fifth Amendment of the United States Constitution, holding that nothing in the decision prevented states from implementing different procedures on independent state grounds.[14] The trial court, overruling Dennis's motion to suppress, noted the conflict between *Burbine* and *Lewis* and stated its ruling would give this Court a chance to "revisit" the *Lewis* decision. During the pendency of this appeal this Court decided *Tilley v. State*,[15] in which we adopted *Burbine* without analysis or explanation. The effect of *Tilley* on this case is discussed below.

¶ 11 Since *Burbine*, several states have considered the issue. While the State claims the majority of states now follow *Burbine*, the cases are not so clear. Some opinions do not distinguish between federal and state constitutions, or are otherwise not helpful to our analysis.[16] Six states follow *Burbine* and

7. 695 P.2d at 530. Oklahoma's constitutional right to counsel is found at Okla. Const. art. II, § 20. Oklahoma's provision against self-incrimination is found at Okla. Const. art. II, § 21.

8. *Lewis*, 695 P.2d . at 531.

9. *Id.* at 530.

10. *Id.*, quoting *State v. Haynes*, 288 Or. 59, 602 P.2d 272 (1979).

11. *Id.*

12. *Id.* at 530–31.

13. 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

14. 475 U.S. at 428, 106 S.Ct. at 1144.

15. 1998 OK CR 43, 963 P.2d 607.

16. *Hunt v. State*, 687 So.2d 1154 (Miss.1996) (no mention of state or federal constitution, issue discussed in footnote); *West v. Kentucky*, 887 S.W.2d 338 (Ky.1994) (holding based on state rule of criminal procedure pre-dating and more

expansive than *Burbine* ). The State cites a Mississippi case, *Lee v. State*, 631 So.2d 824 (Miss. 1994). This case is completely irrelevant, as no attorney was ever retained or attempted to contact police or the defendant; the issue there was whether a third party's ambiguous statements could invoke a defendant's right to counsel. The State cites *State v. Blanford*, 306 N.W.2d 93 (Iowa 1981). This case, predating both *Haynes* and *Burbine*, finds "no basis" under *Miranda* for requiring police to tell a defendant an attorney has called on his behalf (apparently under the federal constitution). The opinion cites no authority for this conclusion. The State cites *Jackson v. Commonwealth*, 255 Va. 625, 499 S.E.2d 538 (1998). This case analogizes to *Burbine* and finds no violation of the state or federal constitution where police refused to tell a juvenile his mother was present in the station during his interrogation. In 1977 a plurality of the Pennsylvania Supreme Court determined officers must tell a suspect if counsel was available. *Commonwealth v. Hilliard*, 471 Pa. 318, 370 A.2d 322 (1977). This was decided under the Fifth Amendment to the United States Constitution, and the case would appear to be superseded by *Burbine* (in 1980 the same court adopted a totali-

rely solely on the federal constitution.[17] Seven states explicitly interpret their own constitutions as offering the same protection as the federal constitution and rely on the *Burbine* reasoning when interpreting their constitutions.[18] Eight states conclude their state constitutions offer more protection than the federal constitution affords.[19] Texas and Connecticut fashioned a case-by-case approach rather than a bright-line rule where the state constitution is involved.[20] The

ty of the circumstances rule on the issue, again relying on federal law, in *Commonwealth v. Rigler*, 488 Pa. 441, 412 A.2d 846 (1980)). The same situation appears to apply to *State v. Hickman*, 175 W.Va. 709, 338 S.E.2d 188 (1985) (cited by the State).

17. *Commonwealth v. Cryer*, 426 Mass. 562, 689 N.E.2d 808 (1998) (finding no federal violation under *Burbine*; specifically does not decide whether state constitution violated since that issue was not presented under facts of case); *State v. Gibson*, 342 N.C. 142, 463 S.E.2d 193 (1995) (relying on *Reese*, below, for federal question and holding failure to inform juvenile of parents' and attorney's presence does not violate state juvenile rights statute); *State v. Reese*, 319 N.C. 110, 353 S.E.2d 352 (1987) (no federal violation, no mention of state constitution); *State v. Waggoner*, 124 Idaho 716, 864 P.2d 162 (Idaho Ct.App.1993) (no federal violation, no mention of state constitution); *Aultman v. State*, 621 So.2d 353 (Ala.Crim. App.1992) (citing 1991 Alabama case, no mention of state constitution in either case); *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542 (1988), *cert. denied*, 489 U.S. 1042, 109 S.Ct. 1099, 103 L.Ed.2d 241 (1989) (no federal violation under *Burbine*, no mention of state constitution); *State v. Drayton*, 293 S.C. 417, 361 S.E.2d 329 (1987), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1060, 98 L.Ed.2d 1021 (1988) (no federal violation under *Burbine*, no mention of state constitution). In 1985, Georgia independently concluded that a defendant was not entitled under the Fifth Amendment to be informed when a retained attorney was present unless the defendant first asked for counsel. *Blanks v. State*, 254 Ga. 420, 330 S.E.2d 575 (1985). Also in 1985, Wyoming determined that, as a suspect had no right to consult with an attorney before agreeing to a breathalyzer test, police failure to tell him his attorney was available was not error. *Wheeler v. State*, 705 P.2d 861 (Wyo.1985).

18. *State v. Stackhouse*, 90 Wash.App. 344, 957 P.2d 218 (1998) (relying on *Earls*, below); *State v. Earls*, 116 Wash.2d 364, 805 P.2d 211 (1991) (state and federal constitutions co-extensive, applies *Burbine*); *Ajabu v. State*, 693 N.E.2d 921 (Ind.1998) (no state law precedent for right to be informed a retained attorney is present, and state and federal doctrine the same); *State v. Hanson*, 136 Wis.2d 195, 401 N.W.2d 771 (1987) (*Burbine* is reasonable consideration of limits of *Miranda*, and state constitution identical with federal and interpreted same way); *State v. Transon*, 186 Ariz. 482, 924 P.2d 486 (Ariz.App. Div. 1 1996) (state constitution no broader than federal constitution, and state rules of criminal procedure not violated where defendant waived *Miranda*

rights before attorney contacted police); *People v. Page*, 907 P.2d 624 (Colo.Ct.App.1995) (declining to adopt or impose state standards differing from the federal constitution); *State v. Stephenson*, 878 S.W.2d 530 (Tenn.1994) (following Wisconsin Supreme Court reasoning, holds defendant knowledge of particular attorney cannot affect ability to understand and, therefore, waive rights); *Lodowski v. State*, 307 Md. 233, 513 A.2d 299 (1986) (court does not find *Burbine* reasoning persuasive but must interpret similar state constitutional provisions as identical to federal interpretation; declines to deviate on a state level from *Burdine* rationale).

19. *People v. Bender*, 452 Mich. 594, 551 N.W.2d 71 (1996); *State v. Simonsen*, 319 Or. 510, 878 P.2d 409 (1994) (en banc) (explicitly reaffirming *Haynes*); *State v. Reed*, 133 N.J. 237, 627 A.2d 630 (1993) (no state constitutional provision, but statutory and common-law right against self-incrimination broader than federal right); *People v. Griggs*, 152 Ill.2d 1, 178 Ill.Dec. 1, 604 N.E.2d 257 (1992) (narrow holding finds state constitutional error only when police fail to inform defendant who knows an attorney has been retained that the attorney is present at the station and asks to see defendant); *Bryan v. State*, 571 A.2d 170 (Del.1990); *Haliburton v. State*, 514 So.2d 1088 (Fla.1987); *People v. Houston*, 42 Cal.3d 595, 230 Cal.Rptr. 141, 724 P.2d 1166 (1986) [the State's claim this has been overruled by constitutional amendment does not appear accurate]. In a pre-*Burbine* case, *State v. Matthews*, 408 So.2d 1274 (La.1982), the Louisiana Supreme Court held that the state constitution and statutes required officers to inform a defendant when a retained attorney was available during interrogation. In *State v. Campbell*, 673 So.2d 1061 (La.App. 3 Cir.1996), a Louisiana appellate court followed *Burbine* in determining that a defendant's federal Sixth Amendment right was not implicated by police failure to inform a defendant his attorney was present; this opinion did not discuss the Fifth Amendment issue nor the state constitution, and does not mention *Matthews*, which appears to be good law. In 1968, New York adopted a strict rule, holding that under the state constitution, if an attorney is available to consult with a suspect, the suspect may waive his *Miranda* rights only after consulting with the attorney. *People v. Arthur*, 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968).

20. *Roeder v. State*, 768 S.W.2d 745 (Tex.App. 1st Dist.1988); *Dunn v. State*, 696 S.W.2d 561 (Tex. Crim.App.1985), *implicitly overruled by Goodwin*

American Bar Association Standards for Criminal Justice also accord with states offering greater protection, rather than *Burbine*.[21]

¶ 12 In *Lewis* we relied on *State v. Haynes*,[22] in which the Oregon Supreme Court interpreted similar provisions providing a right to counsel and a right against self-incrimination in the Oregon constitution. *Lewis* extensively quoted the *Haynes* analysis. *Haynes* discussed the importance of the right to counsel and determined:

> To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. If the attorney appears on request of one's family, that fact may inspire additional confidence. He, too, will perhaps be sent away.... But ... when law enforcement officers have failed to admit counsel to a person in custody or to inform the person of the attorney's efforts to reach him, they cannot thereafter rely on defendant's "waiver" for the use of his subsequent uncounseled statements or resulting evidence against him.[23]

*Haynes* concluded that police failure to inform a suspect a retained attorney was attempting to reach him required reversal because: "When the opportunity to consult counsel is in fact frustrated, there is no room for speculation what defendant might or might not have chosen to do after he had that opportunity."[24] Oregon has explicitly reaffirmed *Haynes* since the *Burbine* decision.[25] However, the Oregon Supreme Court has limited the issue to cases in which an attorney-client relationship exists for a specific charge, and an attorney may not prevent police from questioning a suspect about an unrelated crime for which he does not represent the suspect.[26]

¶ 13 In contrast to the analyses in *Lewis* and *Haynes*, which focus on the ability of the suspect to make a knowing waiver while unaware of important information, courts following *Burbine* tend to cast the issue as one of a suspect's knowledge of outside actions versus an attorney's desire to speak with a client. As the Wisconsin Supreme Court explained:

> Since the knowledge of the location of counsel adds no constitutional rights, does not alter the facts of the case as the suspect knows them, and does not give rise to any coercive influence by the police, such knowledge is not relevant to the suspect's voluntary decision to waive his rights. Although a suspect who was ready to waive his rights might change his mind when told an attorney was waiting to see him, the critical factor would be the convenience of seeing the attorney, not the intelligent perceived need for legal counsel. Since the convenience of the defendant is not constitutionally protected, the location of a particular attorney is not constitutionally required information.[27]

This approach disregards deliberate police efforts at deception.

■ ¶ 14 In *Tilley* we described the holding in *Lewis* and stated, without analysis or citation to any of the authority discussed above:

> While we are cognizant that States are free to provide greater protections in their criminal justice systems than the Federal

---

*v. State*, 799 S.W.2d 719, 729 (Tex.Crim.App. 1990); *State v. Stoddard*, 206 Conn. 157, 537 A.2d 446 (1988). Missouri adopted a totality of the circumstances test in a pre-*Burbine* case and has apparently not addressed the issue since. *State v. Beck*, 687 S.W.2d 155 (1985).

**21.** ABA Standards for Criminal Justice 5–5.1, 5–7.1.

**22.** 288 Or. 59, 602 P.2d 272 (1979).

**23.** 602 P.2d at 278–79.

**24.** 602 P.2d at 272.

**25.** *State v. Neal*, 150 Or.App. 231, 945 P.2d 637 (1997); *State v. Charboneau*, 323 Or. 38, 913 P.2d 308 (1996) (en banc); *State v. Simonsen*, 319 Or. 510, 878 P.2d 409 (1994) (en banc); *State v. Isom*, 306 Or. 587, 761 P.2d 524 (1988).

**26.** *Charboneau*, 913 P.2d at 318–19.

**27.** *Hanson*, 401 N.W.2d at 778.

Constitution requires, we now adopt the Supreme Court's rationale in *Moran*.[28]

Upon reconsideration, taking into account the circumstances presented by this case, we have determined it was unnecessary to completely overrule *Lewis*. Rather than create a bright-line rule either permanently adopting or discarding *Lewis*, we adopt a totality of the circumstances test, described below, to be applied on a case-by-case basis. Application of this test would not change the outcome in *Tilley*. The record in *Tilley* shows the defendant's attorney attempted to contact him by telephone, possibly after he had confessed. Under these facts Tilley cannot show error under the totality of circumstances test. Our holding today applies only where an attorney is present while a defendant is questioned and actively tries to see the defendant, who is not told the attorney is there.

¶ 15 This Court prefers to follow the path chosen by the Texas Court of Criminal Appeals and Connecticut Supreme Court. Before *Burbine*, the Texas Court of Criminal Appeals adopted a case-by-case test to determine whether a defendant's right against self-incrimination under the Texas constitution was violated when he was not informed an attorney was present. *Dunn v. State*[29] rejected a *per se* rule and held courts should examine the totality of facts and circumstances in each case, including the defendant's relation to the attorney, the extent of police knowledge of the crime, police conduct, the nature of the attorney's request to police, and the defendant's background, experience and conduct.[30] Dunn's attorney, retained by his wife, telephoned and went to the station but was denied access, and police refused to tell Dunn his attorney was present. The Texas Court of Criminal Appeals concluded that under these circumstances Dunn's waiver was not voluntary. The Court found the

attorney "did everything short of kicking in the interrogation room door to gain access to appellant—at a time when appellant, if given a knowing and intelligent choice, might certainly have opted to remain silent."[31] These facts are similar to the case before this Court.

¶ 16 *Dunn* was followed in *Roeder v. State*.[32] The lower appellate court compared *Dunn* with *Burbine*, noted *Dunn* was explicitly decided under state constitutional grounds, and concluded *Dunn* was binding even after *Burbine*. Roeder was arrested for a Texas crime by Colorado officers, without a warrant or probable cause, and held isolated for thirty hours until he confessed. During that time Houston officers instructed Colorado officers not to allow a public defender to speak to Roeder, even though Colorado law stated public defenders "shall be" allowed access to arrestees. The court found that the conduct of Texas officers showed an intent to gather as much information as possible while disregarding procedural safeguards. Roeder was a high school graduate with no prior offenses. Under these circumstances the court concluded Roeder's waiver was not valid.

¶ 17 In *Goodwin v. State*[33] the Texas Court of Criminal Appeals refused to follow *Dunn*, finding that it was implicitly overruled by *Burbine*. The court determined that *Dunn* had been decided under both the Texas Constitution and the Fifth Amendment, and therefore was not based on an independent state ground. While *Lewis* cites the Fifth Amendment in its ruling, its discussion and reasoning are based entirely on state law. As the adequacy and independence of the state law are apparent from the face of the opinion, we conclude *Lewis* was decided on independent state grounds,[34] and remain persuaded by the reasoning in *Dunn*.

**28.** *Tilley*, 963 P.2d at 614 (citation omitted).

**29.** 696 S.W.2d at 569.

**30.** *Id.* at 570.

**31.** *Id.* at 569.

**32.** 768 S.W.2d at 753–55.

**33.** 799 S.W.2d 719, 729 (Tex.Crim.App.1990).

**34.** *Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983). *Lewis* describes the issue as one of first impression in our jurisdiction and cites to the Oklahoma constitution at the beginning and end of the opinion. It also mentions the federal constitutional provisions in its closing sentence. *Michigan v. Long* noted that if an independent state law ground was not "clear from the face of the opinion" one should assume the state court

¶ 18 Connecticut adopted a similar test in *State v. Stoddard.*[35] After his arrest, Stoddard's girlfriend hired an attorney who attempted four times to contact him. Each time police untruthfully told the attorney Stoddard was not at the station, and failed to inform him counsel had been retained and was trying to talk to him. The *Stoddard* Court determined that (like Oklahoma) Connecticut had a history of state cases recognizing the significance of the right to counsel. The opinion discusses "the 'unique ability' of counsel to protect the rights of a client undergoing, or confronting the imminent possibility of, interrogation."[36] The opinion notes "counsel is uniquely prepared to assist a suspect in making an intelligent and knowing decision whether to speak or stand mute."[37] The opinion concluded that police must promptly inform a suspect of "timely efforts by counsel to render pertinent legal assistance."[38] The Court described the limits of the burden on police:

> A request is diligent if all necessary steps have been taken to notify the police clearly in the ordinary course of business, timely if made prior to the giving of incriminatory statements, and pertinent if counsel clearly indicates that access to the suspect is sought for the general purpose of providing legal assistance. In any case, counsel's request must be in a form and at a time that affords the police a reasonable opportunity to respond. Second, lack of knowledge on the part of the interrogating officers is not dispositive because it is for the police, as an entity, to establish and maintain adequate procedures that will facilitate the reasonably prompt communication

between an attorney and a suspect. Third, the prior existence of an attorney-client relationship is not relevant to the duty itself. While a suspect may decline the proffered services of a lawyer who unilaterally intervenes in the proceeding, we think it unwise to impose upon the police the responsibility of ascertaining the nature of the putative relationship between counsel and the suspect.[39]

¶ 19 After determining the constitutional issue, the *Stoddard* Court discussed the *per se* rule adopted in cases such as *Haynes.* Noting that speculation about a defendant's actions cuts both ways, *Stoddard* concluded:

> We therefore decline to impose, by judicial fiat, a blanket rule of exclusion or admissibility. Reliance on the totality of the circumstances is consistent with existing rules for the evaluation of the validity of a waiver. The critical question is whether the information not conveyed by the police would likely have changed the defendant's appraisal and understanding of the circumstances.[40]

Using the balancing factors cited above, the Court determined that, under these facts, Stoddard probably would have responded to counsel's offer of assistance and exercised his right to silence. Given the totality of the circumstances Stoddard's waiver was not valid.

¶ 20 We believe this totality of the circumstances approach provides a fair, balanced method to determine whether a defendant's state constitutional rights are violated. Our independent interpretation of Oklahoma constitutional provisions is not circumscribed

reached the decision it expected the federal law required. 463 U.S. at 1040–41, 103 S.Ct. at 3476. We conclude *Lewis* was decided on independent state grounds. First, ample independent state law grounds—the repeated reference to the Oklahoma Constitution—appear in the opinion. Second, the opinion cites to cases from other states relying solely on state laws. Third, the opinion notes the jurisdictional split nationwide; the Court could not have assumed the federal courts would agree, and the language explicitly states the decision is this Court's interpretation regardless of other courts' differing interpretations. *Lewis* did not explicitly say the opinion rested solely on Oklahoma law, but the factors above certainly support that interpretation. This finding is bolstered by the brief ruling

in *Tilley,* where we adopted *Burbine* to resolve a state law question and cited *Lewis* as precedent for the state law issue.

35. 206 Conn. 157, 537 A.2d 446, 452 (1988).

36. *Id.* at 452 (citations omitted).

37. *Id.* (citations omitted).

38. *Id.*

39. *Id.* at 454 (citations omitted).

40. *Id.* at 456 (citations omitted).

by United States Supreme Court interpretation of similar federal provisions. We recognize we held in *State v. Thomason*[41] that our provision against self-incrimination is not broader than that afforded by the Fifth Amendment. However, that case concerned use of handwriting exemplars and was a case of first impression on that issue. Our decision today rests on *Lewis*, state law independently decided before the federal provision was interpreted. The coincidence that the United States Supreme Court chose to interpret the federal provision differently does not change our state law precedent. "It is our right and duty to construe the Constitution and laws of this state, when not in conflict with federal authority, independently of the decisions of any other court."[42] *Lewis* does not conflict with any federal authority; no federal court has attempted to decide this issue on Oklahoma constitutional grounds and the United States Supreme Court expressly limited *Burbine* to federal constitutional issues. We are not persuaded that a restrictive interpretation of federal law should overcome our principled reasoning in *Lewis*. Like Texas, Connecticut, Oregon, Michigan, California, Delaware, Illinois, Florida, and New Jersey, we focus on whether a suspect can truly knowingly waive his rights without knowing an attorney, retained or appointed on his behalf, is there to talk to him. While of course a suspect may refuse a particular attorney's assistance and validly waive his rights, common sense and fundamental fairness suggest the fact of the attorney's presence is important information a suspect would use in determining whether to waive or invoke his rights. Where the totality of the circumstances reflect that a defendant's decision would have been affected had he known an attorney was present, then admission of any statements made during questioning under those circumstances is error.[43]

¶ 21 We now apply this totality of the circumstances test to this case. We look at

Dennis's relation to the attorney, the extent of police knowledge of the crime, police conduct, the nature of the attorney's request, and Dennis's own background, experience and conduct. Dennis had not met Weldon, although his live-in girlfriend hired counsel on his behalf after at least suggesting, in Dennis's presence, she would do so. Police were fairly certain Dennis had committed the crime; there were no eyewitnesses or physical evidence to confirm this and witnesses placing Dennis at the scene were subject to impeachment. Officers prompted Dennis's confession by telling him they "knew" he had owned and sold a .45 Glock pistol when they only suspected this was true. Weldon told officers he represented Dennis and repeatedly demanded to speak with him, and officers knew Weldon would advise Dennis to remain silent. The record does not clearly show that Weldon was present at the station when Dennis made his confession. If it did, our decision might be different.

¶ 22 We turn to Dennis's experience and conduct. Dennis had previous experience with the criminal justice system and had talked to police twice in connection with this case. He had previously received *Miranda* warnings and waived his rights during this investigation. He talked with his girlfriend and mother before questioning began on May 1st, and told officers several times that he had nothing to hide and did not need an attorney. Dennis asks us to speculate that, had he known his attorney was present, his decision to forego counsel may very well have been different. We agree that officers finally convinced Dennis they knew he had something to hide. Dennis's confession was the strongest piece of evidence against him, and Officer Bray testified he knew Weldon would advise Dennis not to talk if Dennis were allowed to see him. However, Dennis (1) knew his girlfriend had offered to call a lawyer; (2) was aware of his right to an attorney; (3) consistently said he did not

**41.** 1975 OK CR 148, 538 P.2d 1080, 1086; *see also Tilley*, 963 P.2d at 614.

**42.** *Scribner v. State*, 9 Okl.Cr.465, 132 P. 933, 938.

**43.** Our adoption of the totality of the circumstances test also comports with our settled law

applying a totality of the circumstances test to the waiver of right to counsel. *See, e.g., Le v. State*, 1997 OK CR 55, 947 P.2d 535, 542, cert. denied, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

need a lawyer; (4) at one time asked for a lawyer then retracted that request and continued talking to police; and (5) by his own testimony, asked whether his lawyer was outside the door but did not demand to see whoever was talking outside. Under these circumstances we conclude Dennis's waiver of his rights to counsel and against self-incrimination was voluntary. The trial court did not err in failing to grant his motion to suppress his statements made on May 1, 1996.

## Decision

¶ 23 The Judgment and Sentence of the District Court is **AFFIRMED**.

STRUBHAR, P.J.: concurs.

JOHNSON, J.: specially concurs.

LUMPKIN, V.P.J., and LILE, J., concur in part, dissent in part.

LUMPKIN, Vice–Presiding Judge: concurs in part/dissents in part.

¶ 1 I concur in the Court's decision to affirm the judgment and sentence in this case. However, I cannot join in the Court's lack of discipline as evidenced by its failure to adhere to the doctrine of *stare decisis*. The Court improperly interprets the Oklahoma Constitution based on a whimsical desire to invoke the constitutional fiat to reach a desired result rather than adhering to a long established logical progression of case law.

¶ 2 The issue in this case concerns a defendant's right to counsel during custodial interrogation, prior to the time criminal charges are filed. The Fifth Amendment to the U.S. Constitution addresses the right to counsel during custodial interrogation. *Battenfield v. State*, 816 P.2d 555, 561 (Okl.Cr.1991) (citing *Michigan v. Jackson*, 475 U.S. 625, 629–30, 106 S.Ct. 1404, 1407–8, 89 L.Ed.2d 631 (1986)). The Sixth Amendment right to counsel, which attaches once criminal charges have been filed, is not an issue in this case. *Id.* (the right to counsel under the Sixth Amendment extends to post arraignment interrogations). Article II, Section 20 of the Oklahoma Constitution is this State's

equivalent of the Sixth Amendment and Article II, Section 21 is this State's equivalent of the Fifth Amendment. As early as 1925, this Court stated, "Section 21 [of the Oklahoma Constitution] corresponds in substance with article 5, and section 30 is identical with article 4, respectively, of the amendments to the Constitution of the United States." *Keith v. State*, 30 Okla.Crim. 168, 171, 235 P. 631, 632 (1925). *See also Buxton v. State*, 37 Okla.Crim. 402, 258 P. 814 (1927); *Layman v. Webb*, 350 P.2d 323 (Okl.Cr.1960).

¶ 3 The most definitive and scholarly discussion of our constitutional provisions was set out by Judge Bussey in *State v. Thomason*, 538 P.2d 1080 (Okl.Cr.1975). In that case, Judge Bussey entered into an in-depth analysis and discussion of the provisions of our State Constitution within the context of the time our Constitution was adopted and the use of its terminology as it related to other constitutions and the Federal Constitution. Placing our Constitution in its historical perspective, the Court in *Thomason* stated:

Our State Constitution was not adopted until Oklahoma was admitted as the 46th State to the Union in 1907, some 15 years after the United States Supreme Court, in *Counselman v. Hitchcock* [142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892)], had already specifically observed that in the various constitutional provisions upon self-incrimination, "there is really, in spirit and principle, no distinction arising out of such difference of language." ... As early as 1913 in *Scribner v. State*, 9 Okl.Cr. 465, 132 P. 933, which discusses at length the origin and history of the privilege against self-incrimination, we recognized that our State constitutional provision upon self-incrimination "is but a reiteration of the common law."

538 P.2d at 1085 (citation omitted). In concluding its interpretation of the issue relating to our State constitutional provision, the Court further stated:

Although we consider the federal cases in this area highly persuasive, we reserve the right and authority to interpret and apply our own constitutional provision upon self-incrimination in a manner that

does not infringe the federal Fifth Amendment privilege as made applicable to the states through the Fourteenth Amendment. *See, Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). **However, we now hold that the particular phraseology contained within our constitutional provision upon self-incrimination is simply declaratory of the common law and does not grant broader protection than that embodied within the Fifth Amendment to the federal constitution. Those cases so indicating to the contrary are hereby overruled.**

*Id.* at 1086 (emphasis added). *See Tate v. State,* 544 P.2d 531 (Okl.Cr.1975); *Billy v. State,* 602 P.2d 237 (Okl.Cr.1979); *Sartin v. State,* 617 P.2d 219 (Okl.Cr.1980); *Perez v. State,* 614 P.2d 1112 (Okl.Cr.1980); *Long v. State,* 706 P.2d 915 (Okl.Cr.1985); *State v. Neasbitt,* 735 P.2d 337 (Okl.Cr.1987); *Tilley v. State,* 963 P.2d 607, 614 (Okl.Cr.1998).

¶4 Just eight (8) months ago, this Court reaffirmed its ninety-three (93) years of jurisprudence in *Tilley v. State* when we held:

While we are cognizant that States are free to provide greater protections in their criminal justice systems than the Federal Constitution requires, we now adopt the Supreme Court's rationale in *Moran* [*v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) ]. Applying *Moran* to the present case, we find Tilley's waiver of his Fifth Amendment rights valid. Tilley was fully advised of his rights and informed of the consequences if he abandoned those rights. Tilley's waiver of his *Miranda* rights was not 'vitiated' when the police failed to inform him that an attorney

was attempting to contact him. This proposition of error is denied.

963 P.2d at 614 (footnote omitted).

¶5 The limits on Article II, Section 21, were even recognized by Judge Parks in his dissent to *Harris v. State,* 773 P.2d 1273, 1278 (Okl.Cr.1989). While acknowledging prior jurisprudence holding that Article II, Section 21, could, in certain circumstance, be broader than the Fifth Amendment, he concluded that the Court's decision in *Harris* prevented further expansion of Article II, Section 21. This is the law which this Court has applied for ninety-three (93) years. The law which we are bound to apply today.

¶6 Instead of relying on this established jurisprudence, the Court relies on a single case, *Lewis v. State,* 695 P.2d 528 (Okl.Cr. 1984), which similarly ignored our settled precedent in order to achieve a particular desired result. Contrary to what the Court says today, a reading of *Lewis* reveals it was not a case based on independent state grounds, but was based upon both the Federal and Oklahoma Constitutions. *Id.* at 531. ("We therefore hold this statement should have been suppressed as obtained in violation of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution and OKLA. CONST., art. II, §§ 7, 20, 21."). The *Lewis* Court engaged in absolutely no discussion of the terminology in those provisions of the Oklahoma Constitution nor a legal analysis of how that interpretation could be made in the context of prior case law. The holding of *Lewis* does not meet the definition of independent state grounds as set out in *Michigan v. Long.*[1] Further, the Court did not

---

1. In *Michigan v. Long,* the Supreme Court stated:

Respect for the independence of state courts, as well as avoidance of rendering advisory opinions, have been the cornerstones of this Court's refusal to decide cases where there is an adequate and independent state ground. It is precisely because of this respect for state courts, and this desire to avoid advisory opinions, that we do not wish to continue to decide issues of state law that go beyond the opinion that we review, or to require state courts to reconsider cases to clarify the grounds of their decisions. Accordingly, when, as in this case, a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy

and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so. If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached. In this way, both justice and judicial administration will be greatly improved. If the state court decision indicates clearly and expressly that it is alternatively based on bona

overrule prior case law which held that Section 21 was the same as the Fifth Amendment. *Lewis* is an anomaly, barren of any scholarly justification and should not be relied upon in the development of our jurisprudence. *Lewis* is an example of this Court's attempt at equity rather than an interpretation of the law. Today the Court is repeating that mistake.

¶ 7 If this Court were presented with the issue in this case as an issue of first impression, my vote might be different. However, it is not. As an appellate judge I am bound by the rule of "*stare decisis*" "to stand by precedent and not to disturb [a] settled point." *Blacks Law Dictionary*, (5 th ed.1979). Our role as an appellate court is to exercise discipline and accountability in applying the doctrine of *stare decisis* to ensure an orderly development of the rule of law. Rather than providing a consistent certainty to ensure such stability, the Court's current course invokes the quintessential "chancellor's foot" I referred to in *Hain v. State*, 852 P.2d 744, 754 (Okl.Cr.1993). In this particular case the "chancellor's foot" used by the Court is the law review methodology of listing the states that have adopted the desired interpretation of their constitutions and then citing that as the justification for adopting the same interpretation in Oklahoma. While that may be an accepted analysis of a uniform state law, it is not proper for constitutional interpretation. Instead of buying into this "everybody is doing it" mindset, the Court should engage in the legal analysis of the syntax of our constitutional provision coupled with the history and jurisprudence relating to it. This Court should never render an interpretation of the law just because it can. The Court should be guided and restrained by prior case law to ensure consistency and finality in the law. This ensures a rule of law and not of men. The approach taken by the Court today ·of disregarding prior jurisprudence denigrates the rule of law and creates a sea of uncertainty upon which judges, lawyers, and citizens must sail in the quest for answers to questions of law.

¶ 8 The plenary power of a court of last resort to interpret and apply the law carries with it an awesome responsibility to exercise self-discipline and adherence to precedent as it fulfills its role. This is especially true when the interpretation and application is of a general constitutional provision rather than a specific statute. The temptation to exercise unbridled discretion to re-create the law in an image a judge or judges believe it should have had from its inception, in disregard of past precedent, constitutes an act of usurpation of the responsibility given rather than stewardship of it. Because the last ninety-three years of jurisprudence from this Court is in conflict with the Court's new method of interpreting Article II, Sections 20 and 21, of the Oklahoma Constitution, I must dissent to that portion of the opinion seeking

---

fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision.
.....
... Our requirement of a "plain statement" that a decision rests upon adequate and independent state grounds does not in any way authorize the rendering of advisory opinions. Rather, in determining, as we must, whether we have jurisdiction to review a case that is alleged to rest on adequate and independent state grounds, see *Abie State Bank v. Bryan*, *supra*, 282 U.S. [765] at 773, 51 S.Ct. [252] at 255 [75 L.Ed. 690], we merely assume that there are no such grounds when it is not clear from the opinion itself that the state court · relied upon an adequate and independent state ground and when it fairly appears that the state court rested its decision primarily on federal law.
463 U.S. 1032, 1040–42, 103 S.Ct. 3469, 3476–77, 77 L.Ed.2d 1201 (1983)(emphasis added)

(footnote omitted). This is the language relied upon by the Supreme Court today (or at least as late as 1996). Accord *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). *See also Pennsylvania v. Labron*, 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996); *Arizona v. Evans*, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).

These cases do not set out any magic words to use, but it is fairly clear that an analysis relying strictly on state grounds, or citations to state law with a specific statement that state law is the only authority utilized would be sufficient to prohibit federal review. If federal law is included in the opinion, it must be clear that such is only being relied on as advisory and the case is being decided based on state grounds.

The dissent in *Moran v. Burbine*, 475 U.S. at 441–42, 106 S.Ct. at 1152 fn. 16, recognized that *Lewis* was an application of Federal constitutional rights, and not based upon independent state grounds.

to create a new right not supported by prior authority.

¶ 9 The law as applied in *Tilley* and consistently over the past 93 years appropriately answers the question in this case. Here, Appellant was repeatedly advised of his rights, he acknowledged understanding of those rights, and knowingly and voluntarily waived them. He declined offers and urgings of family members to obtain an attorney for him. Whether viewed in conjunction with rights under the 5ᵗʰ Amendment to the U.S. Constitution or Art. II, Section 21, of the Oklahoma Constitution, those rights are personal and subject to waiver. The Appellant waived those rights in this case. In *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991), the Supreme Court stated:

> In *Miranda v. Arizona*, we established a number of **prophylactic rights** designed to counteract the "inherently compelling pressures" of custodial interrogation, including the right to have counsel present. *Miranda* did not hold, however, that those rights could not be waived. On the contrary, the opinion recognized that statements elicited during custodial interrogation would be admissible if the prosecution could establish that the suspect "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."

(cite omitted) (emphasis added). The facts in the present case are clear. Appellant exercised "an intentional relinquishment or abandonment of a known right or privilege" when he waived his right to counsel and agreed to talk with the investigators. That analysis answers the question in this case.

¶ 10 The members of this Court should not make decisions merely on how they would have made that decision in the first place or how they would have drafted the Constitution. The Court should not make decisions merely to be seen as moving the law forward or being ingenious in its novel approaches. When established precedent exists, as in this case, such precedent is to be the basis for the Court's decision. Therefore, while I concur in the affirmation of the judgment and sentence in this case, I cannot join in the unsupported interpretation of Article II, Section 21, of the Oklahoma Constitution.

¶ 11 I am authorized to state Judge Lile joins in this separate writing.

JOHNSON, Judge: specially concurs.

¶ 1 I specially concur with the Court's decision herein relative to the involuntariness of a confession made by the Appellant. This Court has heretofore held that a *Miranda* waiver is not voluntary where the Appellant is not told that counsel is present. *Lewis v. State*, 1984 OK CR 93, 695 P.2d 528. This decision rested upon Oklahoma constitutional grounds. Thereafter, the U.S. Supreme Court handed down a decision in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). This Court later addressed this situation in *Tilley v. State*, 1998 OK CR 43, 963 P.2d 607. The undersigned authored that opinion.

¶ 2 One must read the fact situation of *Tilley* to understand the difference between the case in question and the 1998 opinion. From my examination of the facts in *Tilley*, the contact was made by a telephone inquiry and the attorney did not go to the sheriff's office or the police station. The attorney also did not make any specific statements that his client or purported client should not talk in any way to the sheriff or detectives. In *Tilley*, this was more of a casual call and not a confrontation as we have in this case.

¶ 3 The facts in this case are very similar to *Miranda*. In that particular case, the attorney was outside in the hallway and waiting to see his client. This is somewhat similar to what we have in this particular case. There is confusion as to when certain statements were made and, therefore, I would agree to the affirmance herein and would also agree to the principle established by the Court.