2002 OK CR 24

**Patrick Dwayne MURPHY, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

No. D–2000–705.

Court of Criminal Appeals of Oklahoma.

May 22, 2002.

---

James C. Bowen, Tulsa, OK, Richard Lerblance, Hartshorne, OK, Counsel for Appellant at trial.

Rob Barris, Assistant District Attorney, Okmulgee, OK, Philip Cozzoni, Assistant District Attorney, Eufaula, OK, Counsel for the State at trial.

Steven M. Presson, Robert Wade Jackson, Norman, OK, Counsel for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Timothy J. Gifford, Assistant Attorney General, Oklahoma City, OK, Counsel for the State on appeal.

## *OPINION*

LUMPKIN, Presiding Judge:

¶ 1 Appellant, Patrick Dwayne Murphy, was tried by jury in the District Court of McIntosh County, Case Number CF-1999-164A, and convicted of First Degree Murder,

in violation of 21 O.S.Supp.1996, § 701.7(A). The jury found the existence of two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel; and that there is a probability Appellant will commit criminal acts of violence that would constitute a continuing threat to society. The jury set punishment at death, and the trial judge sentenced Appellant in accordance with this verdict. Appellant now appeals.[1]

¶ 2 In August of 1999, Appellant was living with Patsy Jacobs, his alleged "common-law" wife. Ms. Jacobs had previously lived for three years with George Jacobs, the victim in this case, and had a child by him. Appellant and Patsy had an argument about Jacobs a couple of days before Jacobs was murdered. Appellant told Patsy that he was going to get Jacobs and his family one by one.

¶ 3 On August 28, 1999, George Jacobs and his cousin Mark Sumka spent most of the day drinking and driving around Okmulgee, Okfuskee, and McIntosh counties. They reportedly drank two bottles of whiskey and numerous beers that day. At 9:30 p.m., they were headed to a Henryetta bar in Jacobs's Dodge Sedan. Jacobs was passed out in the back seat, and Sumka was driving. (Jacobs's post mortem blood alcohol level would later be determined to be .23)

¶ 4 Sumka and Jacobs passed Appellant as he was driving in the opposite direction. Both cars stopped, and Appellant backed up. Appellant told Sumka to kill the car and get out. Meanwhile, two occupants of Appellant's car, Billy Long and Kevin King, exited the car. Alarmed, Sumka drove away.

¶ 5 Appellant and his companions pursued Sumka in Appellant's car. Appellant was eventually able to force Sumka to stop. At that point, someone from Appellant's car arrived at Sumka's car and began hitting Jacobs.

¶ 6 Sumka got out of his car, but was stopped by Appellant, who said he was going

1. Appellant's Petition in Error was filed in this Court on August 16, 2000. His initial brief was filed on May 3, 2001. The State's brief was then filed on August 31, 2001. The case was submitted to this Court on September 18, 2001 and oral argument was held on February 12, 2002. Appellant has also filed a motion to supplement the record on appeal and application for evidentiary hearing, pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2000).

to do to Jacobs what they had done to him. Sumka could hear the other two men hitting Jacobs. Sumka told Appellant "that was enough, you know, he's passed out." Appellant went over to Jacobs, while Long came over and hit Sumka in the nose. Sumka then saw King drag Jacobs out of a ditch.

¶ 7 Sumka fled momentarily, about one hundred yards from the assault. After five minutes, he decided to return. Upon his arrival, Appellant and his two cohorts told Sumka if he said anything they would kill him and his family. King then smacked Sumka in the jaw. Appellant reportedly instructed King and Long not to hit Sumka again.

¶ 8 Sumka testified that Appellant then took a folding knife he was holding and tossed it into the woods. (The police later recovered this knife.)

¶ 9 Sumka ran over to where Jacobs was laying in a ditch. Jacobs was "barely breathing." Anderson Fields then drove up in another car and asked what was wrong with the guy in the ditch. (He also noticed a fleshy object and blood in the road.) The men told him Jacobs was drunk. They began approaching Fields's car, but he drove away. Fields then phoned the police and drove back to the scene. Everyone was gone. Jacobs lay in the ditch and was barely breathing. Fields found a slash across Jacobs's stomach and chest. His throat had been cut, his face was bloody, and his genitals had been cut off.

¶ 10 Upon Appellant's instructions, Sumka had left the scene with Appellant, Long, and King. During the car ride, Appellant told Sumka they had cut Jacobs's throat and chest and had cut off his privates. King told Sumka they had stuffed Jacobs's genitals into Jacobs's mouth. Appellant then told everyone to take off their clothes because he was going to burn them.

¶ 11 The group later went to the home of Mark Taylor, Appellant's cousin. Appellant told Taylor he had killed Jacobs. Appellant said he had cut Jacobs's stomach and throat, had "cut his dick and his nuts off," had shoved his genitalia into his mouth, and had tried to stomp on the victim's head like a pancake.

¶ 12 The group then traveled to King's house, where Jacobs's son George, Jr. was staying. Appellant said he was going to do the same thing to Jacobs's son. But King's mother came out of the house and thwarted this plan. King went inside, and the rest of the group left. Appellant then burned the bag of incriminating clothes.

¶ 13 When Appellant arrived home that night, he told Patsy Jacobs that George Jacobs had been killed and that he had sliced his throat and stomach. Patsy testified Appellant also said he had cut off Jacobs's genitals so "he won't fuck anyone anymore," including her.

¶ 14 When Appellant was arrested, he admitted kicking Jacobs in the ribs and testicles and cutting his penis. He also admitted hearing Jacobs groan during the attack. He said Jacobs was left alive in a ditch; He was breathing and saying, "Oh."

¶ 15 A state criminalist testified that, after the victim's penis was severed, he was dragged to the side of the road, where his neck and chest were cut. Bloodstains on Jacobs's shoes indicate he had been in an upright position for part of the attack. The medical examiner described the cause of death as blood loss from the various cutting wounds, primarily the genital and neck wounds. Death was not immediate. Jacobs bled to death in somewhere between four to twelve minutes, perhaps even longer. He described the multiple lacerations and fractures the victim suffered to his face, neck, chest, and abdomen.

### ISSUES RELATING TO VOIR DIRE

¶ 16 In proposition eight, Appellant claims the trial court's failure to ensure a complete and adequate record for appellate review violates his "constitutional rights," presumably to due process and/or a fair trial. He claims the court reporter's *voir dire* transcription was inadequate because jurors' names were not identified at times. He claims this is a recurring problem in this county.

¶ 17 Whether or not there is a recurring problem in McIntosh County with regard to the practices of its court reporters, we cannot

say. We can, however, address whether or not there was a constitutionally significant problem concerning the record in Appellant's trial.

¶ 18 Appellant points to "two significant questions" that arose at trial as a result. First, he claims it is impossible to discern from the record whether the juror who "knows that persons of Indian bloodline react differently to alcohol" remained on the jury. Second, it was impossible to discern whether the juror who has a medical background remained on the jury.

¶ 19 However, we find these claims are without merit. While we agree the transcript could *certainly* have been a lot more detailed and clear than it is—and the lack of specificity could create the possibility of a constitutional violation in some future case— here, we have no such concerns. The record shows that the juror who had concerns about Indian bloodlines was a "Ms. Davis." While there were two Ms. Davis's in the pool of prospective jurors, i.e. Kymberly Davis and Teresa Davis, both were removed from the jury by the State through peremptory challenges, the State's first and fifth peremptory challenges. Therefore, Appellant's concern that the juror was removed by the defense, thereby "arguably" creating an ineffective assistance claim is without merit.

¶ 20 Furthermore, with respect to the juror who had a medical background, Appellant's bare claim that this unidentified juror "might pose a problem or benefit to the parties" is not specific enough to survive judicial review. Even assuming, *arguendo*, that defense counsel, armed with the knowledge that this potential juror had a bachelor's degree in laboratory technology and prior experience with a medical diagnostic company, made the decision to challenge or not challenge that juror from serving on the jury pool, we find such decision would not have amounted to ineffective assistance. Such a hypothetical error, which has no bearing on the outcome of the trial, will not mandate reversal here. *Simpson v. State,* 1994 OK CR 40, ¶ 13, 876 P.2d 690, 695.

## FIRST STAGE TRIAL ISSUES

¶ 21 In proposition five, Appellant claims a custodial statement he gave after his arrest violated his right to counsel. He claims the statement should have been suppressed, and the trial court erred by admitting it at trial, following the *Jackson v. Denno*[2] hearing held on its admissibility. In that hearing, the trial judge found Appellant voluntarily and knowingly waived his right to counsel.

¶ 22 Appellant specifically points to transcript excerpts of his interrogation in which he seemed to have been confused about whether or not he was entitled to an attorney, whether or not he was going to ask for an attorney, and whether or not he could speak to the officers with an attorney present.

¶ 23 For example, after receiving the *Miranda* warning and being asked if he desired to speak to police officers, Appellant stated, "Well, I can't answer that right now. I don't know this, this I'm not for sure if I'm gonna have an attorney." The police then told Appellant, "It is your right to have an attorney. Do you want one or do you want to talk to us? It's your choice. Do you want an attorney yes or no?" Appellant asked, "Well, can I still talk to ya'll and still have an attorney present?" The officers responded, "Do you want, you want an attorney? You can have an attorney. If not, you can talk to us right now. It's your choice. I can't tell you what to do." Appellant replied, "I mean, I mean, your (sic) saying I can't do both?" The officer said, "Yeah. Eventually sure. If you want an attorney, we'll get you an attorney. If that's what your (sic) saying."

¶ 24 Similar exchanges continued until Appellant eventually agreed to talk to the police without an attorney present. He then signed a waiver to that effect.

¶ 25 We see no violation of Appellant's constitutional right to counsel from these transcripts or from the testimony given at the *Jackson v. Denno* hearing. Like *Dennis v. State,* 1999 OK CR 23, 990 P.2d 277, Appellant's proposition rests entirely on his ability to get this Court to agree that his vague and noncommittal statements to police

**2.** 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

officers somehow invoked his right to counsel. However, we find his statements do "not even reach the level of an ambiguous request for counsel, and, of course, police are not required to stop questioning when faced with an ambiguous request." *Dennis*, 1999 OK CR 23, ¶ 6, 990 P.2d at 279–80 (construing *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994)).

■ ¶ 26 In proposition seven, Appellant claims his marital privilege rights were violated when his common-law wife, Patsy Jacobs, was made to testify against him.[3] He notes that he sought a ruling barring Ms. Jacobs's testimony, which was argued just before she began testifying at trial. The trial judge overruled this motion, apparently on the basis that Appellant had made similar statements to third parties as to those matters to which Ms. Jacobs testified.

¶ 27 Appellant complains specifically that Ms. Jacobs's testimony provided motive, because she was the only one who testified that Appellant had said he was going to "get" the victim and the victim's family "one by one." Appellant points out that "[n]o other witness could testify to that extremely damaging statement."

¶ 28 But as the State aptly pointed out during oral arguments on this issue, it was defense counsel, not the State, who elicited this testimony. During Ms. Jacobs's direct examination, the State asked her questions regarding statements Appellant made after the killing, statements that were similar that he made to others.

¶ 29 During cross-examination, however, defense counsel asked Ms. Jacobs about a handwritten statement she had made about three or four days after the murder. Defense counsel specifically asked Ms. Jacobs about a portion of her statement that addressed a fight she and Appellant had on the Thursday night before the murder. In the statement, Ms. Jacobs apparently mentioned that part of the fight had to do with her previous relationship with George Jacobs and that she and Appellant fought frequently about George Jacobs. It appears defense counsel was attempting to highlight the domestic nature of this dispute.

¶ 30 On redirect, after defense counsel had opened the door regarding Ms. Jacobs's statement, the prosecutor asked Ms. Jacobs about what Appellant had said to her "in regard to George Jacobs and the Jacobs family during that argument?" At this point, Ms. Jacobs stated that Appellant had told her he was going to get George Jacobs, George's brothers, and George's two sons "one by one." Defense counsel lodged no objection to these statements, but he did ask about those statements again during recross. Here, Ms. Jacobs again admitted Appellant had threatened to kill the victim, that they had argued about this same issue previously, and that Appellant had told her Ms. Jacobs could move out and get back together with George Jacobs if she so desired.

■ ¶ 31 Under these circumstances, any allegation of error with respect to the violation of a marital privilege [4] was waived, for

3. During the preliminary hearing, a similar motion was raised by Appellant. In that setting, the State stipulated to the fact that Appellant and Patsy Jacobs are common law spouses, but argued that what was told to Ms. Jacobs was essentially the same things Appellant told third parties. Based upon the finding of a common law marriage, the Associate District Judge ruled in favor of Appellant, saying the issue could be raised at a later time before Judge Taylor. As a result, the State declined to call Ms. Jacobs to testify at the preliminary hearing. At trial, the State did not specifically concede the existence of a common law marriage.

4. The marital privilege, set forth at 12 O.S.1991, § 2504 "draws no distinction between types of marriage, and, therefore, as was true under prior common law, the privilege would apply equally to common law and ceremonial marriages." *Blake v. State*, 1988 OK CR 272, ¶ 4, 765 P.2d 1224, 1225 (*quoting* K. McKinney, *Privileges*, 32 Okla.L.Rev. 307, 326 (1979)). However, before one can take advantage of this privilege, one must first prove, by clear and convincing evidence, the existence of a valid common law marriage. This includes an actual mutual agreement between the spouses to be husband and wife, a permanent relationship, an exclusive relationship—proved by cohabitation as man and wife, and the parties to the marriage hold themselves out publicly as man and wife. *Blake*, 1988 OK CR 272, ¶ 4, 765 P.2d at 1225. Whether the evidence presented in this record meets this burden of proof is a question of fact we do not need to address due to Appellant's waiver of the issue. However, we do set it forth here to ensure a complete record.

defense counsel, not the State, was the source of this evidence being admitted into the record. This was a matter of defense trial strategy for the purpose of showing that this crime was the result of a heated marital dispute, not just some random act.

### SENTENCING STAGE ISSUES

¶ 32 In his first proposition, Appellant claims there was, as a matter of law, insufficient evidence admitted at trial to support the heinous, atrocious, or cruel aggravating circumstance. He asks this court to abandon a deferential standard for reviewing the sufficiency of evidence of an aggravating circumstance, arguing we must use *de novo* review. He further claims the jury instructions did not adequately inform jurors that they must necessarily find either torture or serious physical abuse in order to support this aggravator.

¶ 33 The crux of Appellant's argument, however, is that the evidence of torture was insufficient because there was "nothing, absolutely nothing, in the record to show that (Jacobs) was consciously aware of the injury being inflicted." (Appellant's Brief, page 14).

■ ¶ 34 We disagree. Appellant told the police Jacobs was groaning during the attack, and that he was still alive, breathing, and saying "oh" when they left him bleeding by the side of the road. The process of bleeding to death took as little as four minutes, but possibly more than twelve. There was testimony that his severed genitals were placed into his mouth at one point, and, if true, the victim may still have been alive after this point, for the genitals were found at a distance from the body. There was also testimony that Jacobs had been in an upright position at one point, for blood was found on the top of his shoes. The medical examiner testified that, although the victim had a blood alcohol content of .23, a normal person would be impaired, but still able to function, at this level.

¶ 35 We decline to accept Appellant's *de novo* review plea. Accordingly, we find the evidence admitted at trial, when viewed in a light most favorable to the State, was sufficient to find beyond a reasonable doubt that the murder was especially heinous, atrocious or cruel. *Black v. State*, 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074. Furthermore, the jury instructions, taken as a whole, accurately stated the applicable law.

■ ¶ 36 In his second proposition, Appellant claims the heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad. He claims that due

Ms. Jacobs testified that she had known Appellant for six or seven years and had lived with him for five and a half years. Prior to that time, she had lived with the victim for three years and had had a ten-year old daughter with him. While Ms. Jacobs testified she held herself out as Appellant's common law wife and was in that relationship in August of 1999, she was less than specific about what they had done to hold themselves out as common law husband and wife, stating, "We done a lot of things, yeah, that common law wife's do, bank accounts and—I've used his last name." She did not use his name any longer, however, and the only time she recalled ever having used Appellant's name was two or three months before the trial, for purposes of getting a telephone listing. Actually, she had always "gone by" the last name of Jacobs, which was apparently obtained through her relationship with the victim.

Ms. Jacobs did not testify regarding a specific agreement she and Appellant had reached regarding their relationship. There was some evidence the relationship was a rocky one, and a strong suggestion Appellant's actions were motivated by jealousy over Ms. Jacobs's relationship with the victim. Although Ms. Jacobs had lived with the victim for years and had a child with him, she denied they had never been in a marriage relationship, common law or otherwise. However, following the victim's murder, Ms. Jacobs had submitted a claim for George Jacobs's funeral expenses to a victim of crimes coordinator that indicated she was George Jacobs's common law wife. Ms. Jacobs testified that the document had been prepared for her, but she had not changed the common law description before submitting it.

Beyond the lengthy cohabitation and a few other scant facts, the record is void of supporting evidence regarding the existence of a common law marriage at the relevant time. For example, there is no evidence of jointly-held property, insurance policies, specific information on bank accounts, wills, tax filings, adoption records, documents referring to each other as husband and wife, or third party perceptions that the couple was married. There are, however, two defense exhibits in which Ms. Jacobs is identified as Appellant's common law wife, but these documents arose after legal proceedings had commenced. Moreover, Appellant described Ms. Jacobs as his girlfriend during interviews, not his wife.

process is violated in Oklahoma because juries are not specifically informed "that the heinous, atrocious, or cruel aggravating circumstance is limited to crimes involving torture or serious physical abuse" and they are not provided definitions for "serious physical abuse" or "torture". He admits, however, that this Court has consistently rejected this claim in capital appeals, and he asks this Court to reconsider those decisions.

¶ 37 Appellant has not convinced us that our prior decisions erroneously resolved this issue. *See e.g., Alverson v. State*, 1999 OK CR 21, ¶ 54–56, 983 P.2d 498, 516–17, *cert. denied*, 528 U.S. 1089, 120 S.Ct. 820, 145 L.Ed.2d 690 (2000) (finding OUJI–CR 2d 4–73 is constitutional, sufficiently limiting, and self-explanatory); *Le v. State*, 1997 OK CR 55, ¶ 35, 947 P.2d 535, 552, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998) (rejecting the notion that torture or serious physical abuse needs further definition). We thus find Appellant's jury was properly instructed on the heinous, atrocious, or cruel aggravating circumstance and that due process was not offended.

██ ¶ 38 In his third proposition, Appellant claims Oklahoma's continuing threat aggravating circumstance [5] is unconstitutionally vague and overbroad and violates due process as a "standardless catch-all." He claims the aggravator, as applied in Oklahoma, "does nothing to separate those defendants who should be considered death eligible from those who should not." (Appellant's Brief, page 23.) He claims the word "probability" in the statute is a statistical term that precludes narrowing. He also claims important terms from the governing statute are not defined. He also points to cases decided by this Court that relied on *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). He claims that reliance is misplaced, insofar as the way Oklahoma applies the continuing threat aggravator.

¶ 39 We have repeatedly rejected these same arguments in numerous cases. *See, e.g., Williams v. State*, 2001 OK CR 9, ¶ ¶ 75–82, 22 P.3d 702, *cert. denied*, —— U.S. ——, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002) (finding

the applicable jury instruction is constitutional, not vague, and "a correct statement of the law"); *Wackerly v. State*, 2000 OK CR 15, ¶¶ 50–51, 12 P.3d 1, *cert. denied*, 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001) (finding the phrase "the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" is clear and does not require further definition); *Rogers v. State*, 1995 OK CR 8, ¶ 40, 890 P.2d 959, *cert. denied*, 516 U.S. 919, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995) (noting the Court has consistently rejected the notion that the aggravator is standardless or all-inclusive.) We continue to find the continuing threat aggravator is constitutionally applied in Oklahoma, and, more specifically, was constitutionally applied as to Appellant in this case. Additionally, this Court's reliance on *Jurek* has not been misplaced.

¶ 40 In his fourth proposition, Appellant claims the victim impact evidence admitted in his trial exceed what is constitutionally permissible, i.e., it "characterized the offense, the perpetrator, and recommended the punishment", and thus deprived him of a fair trial and due process under the United States Constitution and the Supreme Court's decisions in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) and *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). He claims Oklahoma's governing statute, 22 O.S.Supp. 1998, § 984(1) and this Court's interpretation thereof are unconstitutional. He also claims the statements were far more prejudicial than probative and that they contained hearsay and conjecture components.

¶ 41 Appellant specifically complains of the following from the written, but brief, victim impact statements that were read to jurors. First, the victim's brother Rueban stated he could not understand why Appellant would want to kill his brother and that Appellant "should get the death penalty for taking an innocent life. I pray that he will not ever get out of jail and do bragging." Second, the victim's brother Frank stated, "I believe in

---

**5.** More specifically, "The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." 21 O.S.1991, § 701.12.

the Bible. I believe an eye for any eye and that they should be put to death." Third, the victim's sister Irene's statement commented on her anger at the "way (George) was murdered" and took the position that her brother "had a right to be here and alive today." Irene also stated, "I hope you see that no one in the world should ever be free who committed such a crime." Fourth, the victim's sister Nadine stated, "I just hope and pray that these killers get the most severe punishment. There is no mercy for them." Appellant claims these statements amounted to super-aggravators.

■ ¶ 42 Appellant did not object to the statements when they were read in court, thus waiving all but plain error. *Miller v. State,* 2001 OK CR 17, ¶ 36, 29 P.3d 1077, 1085. We find no plain error occurred.

¶ 43 In at least three decisions, this Court has taken the position that *Payne* appears to have overruled *Booth* with respect to the issue of whether or not victim impact statements could include characterizations of the defendant, the crime, and opinions in regard to sentencing. *See, e.g., Turrentine v. State,* 1998 OK CR 33, ¶ 94, 965 P.2d 955, 980, *cert. denied,* 525 U.S. 1057, 119 S.Ct. 624, 142 L.Ed.2d 562 (1998) (finding characterizations and opinions about the crime, the defendant, and the appropriate punishment no longer barred by Supreme Court); *Ledbetter v. State,* 1997 OK CR 5, ¶ 27, 933 P.2d 880, 890–91 (*Booth*'s Eighth Amendment prohibition against such evidence has been apparently overruled by *Payne*); *Conover v. State,* 1997 OK CR 6, ¶ 60, 933 P.2d 904, 920 (*Payne* "implicitly overruled that portion of *Booth* regarding characterizations of the defendant and opinions of the sentence.").

¶ 44 We note here, however, that in footnote two of *Payne*'s majority opinion and in Justice O'Connor's concurring opinion, the Supreme Court left open the question about admissibility of victim impact evidence regarding characterizations and opinions about the crime, the defendant, and the appropriate

sentence because no such evidence was presented in that case. *Payne,* 501 U.S. at 830, 833, 111 S.Ct. at 2611–13.

■ ¶ 45 Nevertheless, we note the Supreme Court has denied certiorari in *Turrentine,* and, since that time, we have continued to approve of such evidence in other capital cases. *See Young v. State,* 2000 OK CR 17, ¶ 83, 12 P.3d 20, *cert. denied,* 532 U.S. 1055, 121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001) ("victim impact witness' opinion as to the appropriateness of the death penalty is admissible, but is limited to the simple statement of the recommended sentence without amplification."); *Welch v. State,* 2000 OK CR 8, ¶ 40, 2 P.3d 356, 373, *cert. denied,* 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000) ("victim impact testimony may include information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence."). We therefore reject Appellant's contention that our interpretation of *Payne* and *Booth,* or for that matter our own statute, is erroneous or unconstitutional.

■ ¶ 46 Furthermore, we find no plain error in the admission of the victim impact statements in question. While the brief testimony from the victim's brother—regarding his belief in the Bible and an "eye for an eye"—was an inappropriate overamplification that should have been stricken,[6] taken as a whole, the testimony was within the bounds of admissible evidence, and its focus did not have such a prejudicial effect or so skew the presentation as to divert the jury from its duty to reach a reasoned moral decision on whether to impose the death penalty. *Short v. State,* 1999 OK CR 15, ¶ 59, 980 P.2d 1081, 1101, *cert. denied,* 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). The *Cargle v. State,* 1995 OK CR 77, 909 P.2d 806 instruction was given, thereby insuring jurors understood the proper weight to give such evidence, including any that was borderline or that crossed over the line.[7]

---

**6.** See *Washington v. State,* 1999 OK CR 22, ¶ 62, 989 P.2d 960, 978–79.

**7.** See *Miller,* 2001 OK CR 17, ¶ 38, 29 P.3d at 1085 (noting the importance of using the *Cargle*

instructions when victim impact evidence is borderline or crosses over the line of what can be considered permissible.)

¶ 47 Accordingly, we find the victim impact evidence was not "so unduly prejudicial that it render(ed) the trial fundamentally unfair." *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608. We further find the evidence did not act as a super-aggravator, nor do we find any support for Appellant's bare claim that the statements "contain hearsay and conjecture components."

¶ 48 In proposition nine, Appellant claims the trial court's failure to define life without parole denied him due process of law and a fundamentally fair trial. To support this proposition, Appellant points to a motion he filed prior to trial in which he requested the trial court to allow testimony or "evidence" regarding "the effects and conditions of a sentence of life without the possibility of parole."

¶ 49 Contrary to Appellant's claim, this motion was not a request for the trial court to provide the jury with instructions regarding the actual meaning of life without parole. Rather, it was a request to produce *evidence* to the jury during the second stage regarding distinctions between the sentencing options, relief available from the Department of Corrections, and the conditions and restrictions associated with a sentence of life without parole.

¶ 50 Be that as it may, the motion was not denied, as Appellant suggests. Rather, the trial judge ruled he would allow argument regarding this issue, but no evidence. (O.R. at 192.) The trial judge specifically stated defense counsel could write the words "life without parole" for jurors during arguments, and underline the words "without parole." He also allowed defense counsel to tell jurors that "life without parole means life without parole." Defense counsel went even a little further than this, telling jurors that they had the option of "putting him in prison for the rest of his life ... don't give him the possibility of parole."

¶ 51 This is not a case where a specific instruction was requested and refused, nor is it a case where the jury sent back a note asking for additional information on what life without parole means. Indeed, this is a case where jurors were told, essentially, that life without parole means what it says.

¶ 52 Moreover, this Court has, in numerous instances, stated the meaning of life without parole is self-explanatory and that an instruction on its meaning is not required. *Powell v. State*, 2000 OK CR 5, ¶ 127, 995 P.2d 510, 536, *cert. denied*, 531 U.S. 935, 121 S.Ct. 321, 148 L.Ed.2d 258 (2000); *Howell v. State*, 1998 OK CR 53, ¶ 8, 967 P.2d 1221, 1225, *cert. denied*, 528 U.S. 834, 120 S.Ct. 93, 145 L.Ed.2d 79 (1999); *McCracken v. State*, 1994 OK CR 68, ¶ 49, 887 P.2d 323, 334, *cert. denied*, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995). Accordingly, we find Appellant was not denied due process or a fundamentally fair trial when the trial judge allowed even more information on this issue than is currently required.

### ISSUES RELATING TO BOTH STAGES

¶ 53 In proposition six, Appellant claims his trial counsel was ineffective as follows: (1) by failing to put on adequate and thorough expert testimony in the mitigation stage regarding Appellant's alleged neuropsychological dysfunction;[8] (2) by failing to attack the constitutionality of the heinous, atrocious, or cruel aggravating circumstance; and (3) by failing to rehabilitate four potential jurors who were stricken for cause after having expressed reservations about imposing the death penalty.

¶ 54 First, we find Appellant's trial counsel was not constitutionally ineffective with respect to expert testimony presented in the mitigation stage. Having reviewed Appellant's motion to supplement, we find Appellant has not sufficiently rebutted the strong presumption of regularity in the trial proceedings or shown by clear and convincing evidence that there is a strong possibility that trial counsel was ineffective in failing to utilize or identify the evidence reflected in Dr. Bianco's report concerning an alleged

8.  Appellant seeks an evidentiary hearing on this sub-issue and requests a supplementation of the record with respect to the Neureopsychology As-sessment Report of Dr. Faust Bianco conducted in February of 2001.

neuropsychological dysfunction.[9] Indeed, the presentation of detailed evidence concerning the behavioral impact of the combination of Appellant's possible brain damage and his chronic alcohol abuse, could reasonably be viewed as mitigating to one person and aggravating to another. That being so, we find trial counsel's use of such evidence falls under the large umbrella of what this Court would deem to be trial strategy. Counsel's actions with respect to Dr. Sharp do not fall outside the wide range of reasonable assistance or leave this Court with grave doubts regarding the verdict or sentence. *Simpson*, 1994 OK CR 40, ¶ 37, 876 P.2d at 702. The motion to supplement and application for evidentiary hearing is **DENIED**.

¶ 55 Second, Appellant's trial counsel was not ineffective for failing to attack the constitutionality of the heinous, atrocious, or cruel aggravating circumstance. Counsel will not be deemed ineffective for failing to raise a claim that this Court has consistently held to be meritless. *Battenfield v. State*, 1998 OK CR 8, ¶ 15, 953 P.2d 1123, 1128.

¶ 56 Third, Appellant claims his trial counsel was ineffective for failing to attempt to rehabilitate four potential jurors. However, each of these would-be jurors clearly indicated they were irrevocably committed against one penalty option, they could not assess the death penalty under any circumstances, or they would not consider all three punishments. *See Powell*, 2000 OK CR 5, ¶ 32, 995 P.2d at 521 (restating principle that prospective jurors must be willing to consider all the penalties provided by law and not be irrevocably committed to one punishment option). As in *Harjo v. State*, 1994 OK CR 47, ¶ 49, 882 P.2d 1067, 1077, *cert. denied*, 514

U.S. 1131, 115 S.Ct. 2007, 131 L.Ed.2d 1007 (1995), these veniremen were properly removed under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

¶ 57 Appellant has failed to show any errors by counsel that were so serious as to deprive Appellant of a fair trial, a trial whose result is reliable. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). This proposition fails.

¶ 58 In his tenth proposition, Appellant claims the cumulative effect of the errors raised in this appeal denied him a fundamentally fair trial. We have found no error, and thus we find no cumulative error.

## *MANDATORY SENTENCE REVIEW*

¶ 59 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances set forth in 21 O.S.1991, § 701.12.

¶ 60 Turning to the second portion of this mandate, the jury found the existence of two aggravating circumstances: the murder was especially heinous, atrocious, or cruel; and there is a probability Appellant will commit criminal acts of violence that would constitute a continuing threat to society. We have already found sufficient evidence to support the first aggravating circumstance.

¶ 61 Regarding the second aggravator, there was evidence Appellant discussed killing the victim before the crime, the crime was particularly brutal, and there was evi-

---

9. Indeed, Dr. Bianco's neuropsychological report indicates Appellant's neuropsychological performance was not "severe enough to be classified as impairments, but rather decreases in cognitive functioning." However, according to Dr. Bianco, Appellant's decreased functioning would possibly, "even likely" rise to the level of impaired when he had been drinking. But Dr. Bianco was less emphatic in other parts of his report, concluding that Appellant has a "limited amount of cognitive reserve" that "may be more effected when intoxicated than someone who has an average cognitive reserve". He also found that "the neuropsychological testing does not show any pattern of specific cognitive dysfunction in the

impaired range." We find the sum total of Dr. Bianco's conclusions, while perhaps more specific, is not significantly different from the testimony and evidence given by Dr. Sharp at trial regarding Appellant's alcoholic blackouts, lack of impulse control, prior head injuries, the suggestion that Appellant "may suffer from mild organic damage", and the fact that "with Patrick in particular, he's no doubt got some degree of damage", possibly relating to accidents Appellant had suffered in the past. Taken in its best light, the report is not sufficient to meet the requirements of Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2000) and does not warrant an evidentiary hearing.

dence Appellant intended to kill the victim's relatives and took steps in that regard. We find the evidence sufficient to support both aggravators.

■ ¶ 62 The following mitigating evidence was presented by Appellant: he did not have any significant history of prior criminal activity; his capacity to appreciate the criminality of his conduct or conform such conduct to the requirements of the law was impaired by alcohol; he was under the influence of emotional disturbance by virtue of his alcohol dependence; he acted under circumstances "which tended to reduce the crime in that he was under the influence of alcohol"; he is likely to be rehabilitated; he cooperated with authorities; his age; his character; his emotional and family history; the fact that he suffers from mild mental retardation; the relationship Ms. Jacobs formerly had with the victim; he has some degree of brain damage, possibly due to prior head injuries; and his poor impulse control and frequent blackouts.

¶ 63 Upon review of the record and after carefully weighing the aggravating circumstance and the mitigating evidence, along with the errors alleged in this appeal, we find the sentence of death to be factually substantiated and appropriate. We cannot say the sentence of death is being imposed under the influence of passion, prejudice, or any other arbitrary factor.

## DECISION

¶ 64 The judgment and sentence are hereby **AFFIRMED**.

JOHNSON, V.P.J., and LILE, J., concur.

STRUBHAR, J., concurs in result.

CHAPEL, J., concurs in part/dissents in part.

CHAPEL, Judge, concurs in part/dissents in part:

¶ 1 I disagree completely with the Court's resolution of the marital privilege claim. This claim was not waived. Counsel for Murphy objected to Patsy Jacobs testifying before she testified and the objection was based upon the marital privilege. Furthermore, contrary to the argument put forth in footnote 4 of the Court's opinion, there was more than clear and convincing evidence of the existence of a common law marriage; there was a stipulation by the State in this very prosecution that there existed a common law marriage. Indeed, the State in its Brief filed with this Court did not even argue against the existence of a common law marriage.

¶ 2 As much as I disagree with the Court's resolution of the marital privilege claim, I would not reverse the conviction on this claim. Rather, I would resolve this claim by upholding the trial court's ruling that the matters about which Patsy Jacobs was to testify were not protected by the privilege.

¶ 3 Although, I would affirm the conviction, I would vacate and modify the sentence to life without parole because the heinous, atrocious, or cruel aggravator should be stricken for insufficient evidence leaving only the continuing threat aggravator. I would not attempt to reweigh the evidence under the circumstances of this case because I do not believe that an appellate court could reasonably conclude that the jury would have imposed the death sentence if it had not considered the heinous, atrocious, or cruel aggravator.